IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

THOMAS O. MILLER,

        Plaintiff,

        v.                              Civil Action No. 1:08-CV-223

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.    <u>Background</u>

Plaintiff, Thomas Miller (Claimant), filed a Complaint on December 24, 2008, seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on August

13, 2009.[2]  Claimant filed her Motion for Summary Judgment on September 8, 2009.[3]

Commissioner filed his Motion for Summary Judgment on October 7, 2009.[4]  Plaintiff filed a

Response to Commissioner's Motion for Summary Judgment on October 21, 2009.[5]

---

[1] Docket No. 1.

[2] Docket No. 9.

[3] Docket No. 12.

[4] Docket No. 13.

[5] Docket No. 15.

B.      The Pleadings

        1.      Plaintiff's Brief in Support of Motion for Summary Judgment.

        2.      Defendant's Brief in Support of Motion for Summary Judgment.

        3.      Plaintiff's Reply Brief.

C.      Recommendation

        I recommend that:

        1.      Claimant's Motion for Summary Judgment be **DENIED** because the ALJ properly considered the medical opinions of record, properly considered Claimant's credibility, and included all limitations confirmed by the record in the hypothetical question posed to the VE.

        2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.

## II.  Facts

A.      Procedural History

        Claimant filed a second application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) on February 17, 2005, alleging disability since June 18, 2002, due to low back and leg pain.  (Tr. 127-33).  The claim was denied initially on May 26, 2005, and upon reconsideration on October 6, 2005.  (Tr. 95, 99).  Claimant filed a written request for a hearing on October 24, 2005.  (Tr. 94).  Claimant's request was granted, and a hearing was held on September 26, 2006.  (Tr. 45-89).

        The ALJ issued an unfavorable decision on December 28, 2006.  (Tr. 15-31).  The ALJ determined Claimant was not disabled under the Act because Claimant had the residual

functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b). (Tr. 15). On January 6, 2007, Claimant filed a request for review of that determination. (Tr. 13-14). The request for review was denied by the Appeals Council on October 28, 2008. (Tr. 7-9). Therefore, on October 28, 2008, the ALJ's decision became the final decision of the Commissioner.

Having exhausted his administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

B.    Personal History

Claimant was born on May 7, 1961, and was forty-one (41) years old as of the onset date of his alleged disability and forty-five (45) as of the date of the ALJ's decision. (Tr. 54). Claimant was therefore considered a "younger person," under the age of 50 and, generally, whose age will not seriously affect the ability to adjust to other work, under the Commissioner's regulations. 20 C.F.R. §§ 404.1563(c), 416.963(c) (2009). Claimant graduated from high school and has past work experience as a self-employed timber cutter, sawmill cutter, and construction surveyor. (Tr. 56, 58-60).

C.    Medical History

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's determination that Claimant's subjective complaints were not entirely credible:

**Progress Notes, Dr. Lattimer, Lattimer Chiropractic Clinic, 3/23/02 - 3/2005 (Tr. 345-69)**
- 3/23/02
  - low back pain
  - diagnosis: acute lumbar sprain/strain; acute thoracic sprain/strain; acute cervical sprain/strain
- 6/18/02

- • procedure: manipulation
- • 6/19/02 x-ray
  - • findings: no pathologies; misalignments at the PIR-sac, PLS-L5 areas
- • 6/21/02
  - • procedure: manipulation
  - • diagnosis: acute lumbar sprain/strain; acute thoracic sprain/strain; acute cervical sprain/strain
- • 6/22/02
  - • low back pain
  - • procedure: manipulation
  - • diagnosis: acute lumbar sprain/strain; acute thoracic sprain/strain; acute cervical sprain/strain
- • 6/26/02
  - • low back pain
  - • procedures: manipulation
  - • diagnosis: acute lumbar sprain/strain; acute thoracic sprain/strain; acute cervical sprain/strain
- • 7/2/02
  - • procedures: manipulation
- • 7/3/02 MRI
  - • impression: mild disc degeneration and diffuse bulging at L4-5 without frank herniation or clear-cut direct neural compromise; minimal degeneration involving disc material at T11-12
- • 7/6/02
  - • procedures: manipulation
  - • diagnosis: acute lumbar sprain/strain; acute thoracic sprain/strain; acute cervical sprain/strain
- • 7/12/02
  - • procedures: manipulation; massage
  - • diagnosis: acute lumbar sprain/strain; acute thoracic sprain/strain; acute cervical sprain/strain
- • 7/15/02
  - • technic: gonstead
- • 8/20/02
  - • procedures: manipulation
  - • diagnosis: acute lumbar sprain/strain; acute thoracic sprain/strain; acute cervical sprain/strain
- • 9/7/02
  - • headaches; pain between shoulders; low back pain
  - • procedures: manipulation
  - • diagnosis: acute lumbar sprain/strain; acute thoracic sprain/strain; acute cervical sprain/strain
- • 9/16/02
  - • procedures: manipulation

- • diagnosis: acute lumbar sprain/strain; acute thoracic sprain/strain; acute cervical sprain/strain
- • 9/18/02
  - • procedures: manipulation
  - • diagnosis: acute lumbar sprain/strain; acute thoracic sprain/strain; acute cervical sprain/strain
- • 9/21/02
  - • procedures: manipulation
  - • diagnosis: acute lumbar sprain/strain; acute thoracic sprain/strain; acute cervical sprain/strain
- • 9/24/02
  - • procedures: manipulation
  - • diagnosis: acute lumbar sprain/strain; acute thoracic sprain/strain; acute cervical sprain/strain
- • 9/30/02
  - • procedures: manipulation
  - • diagnosis: acute lumbar sprain/strain; acute thoracic sprain/strain; acute cervical sprain/strain
- • 10/4/02
  - • procedures: manipulation
  - • diagnosis: acute lumbar sprain/strain; acute thoracic sprain/strain; acute cervical sprain/strain
- • 10/8/02
  - • low back pain
  - • procedures: manipulation
  - • diagnosis: acute lumbar sprain/strain; acute cervical sprain/strain
- • 10/11/02
  - • shoulder pain; low back pain
  - • procedures: manipulation
  - • diagnosis: acute lumbar sprain/strain; acute cervical sprain/strain; acute thoracic sprain/strain
- • 10/16/02
  - • low back pain; hip pain
  - • procedures: manipulation
  - • diagnosis: acute lumbar sprain/strain; acute thoracic sprain/strain; acute cervical sprain/strain
- • 10/18/02
  - • low back pain; leg pain
  - • procedures: manipulation
  - • diagnosis: acute lumbar sprain/strain; acute thoracic sprain/strain; acute cervical sprain/strain
- • 10/25/02
  - • procedures: manipulation
- • 11/1/02

- procedures: manipulation
- diagnosis: acute lumbar sprain/strain; acute thoracic sprain/strain; acute cervical sprain/strain

- 11/8/02
  - pain between shoulders; low back pain; hip pain
  - procedures: manipulation
  - diagnosis: acute lumbar sprain/strain; acute thoracic sprain/strain; acute cervical sprain/strain
- 11/15/02
  - procedures: manipulation
  - diagnosis: acute lumbar sprain/strain; acute thoracic sprain/strain; acute cervical sprain/strain
- 12/2/02 Disability Certificate
  - certify that Claimant has been totally incapacitated
- 12/10/02
  - low back pain; hip pain
  - procedures: manipulation
  - diagnosis: acute lumbar sprain/strain; acute thoracic sprain/strain; acute cervical sprain/strain
- 12/18/02
  - arm pain; hip pain
  - procedures: manipulation
  - diagnosis: acute lumbar sprain/strain; acute thoracic sprain/strain; acute cervical sprain/strain
- 1/27/03
  - procedures: manipulation
- 7/16/03
  - procedures: manipulation
  - diagnosis: acute lumbar sprain/strain
- 8/18/03
  - procedures: manipulation
  - diagnosis: cervical sprain/strain; thoracic sprain/strain
- 8/26/02
  - procedures: manipulation
- 9/8/03
  - beck pain; low back pain; hip pain
  - procedures: manipulation
  - diagnosis: lumbar sprain/strain; thoracic sprain/strain; cervical sprain/strain
- 9/03
  - procedures: manipulation
  - diagnosis: lumbar sprain/strain; thoracic sprain/strain; cervical sprain/strain
- 1/31/05
  - neck pain; pain between shoulders; shoulder pain
  - objective findings: thoracic spasms

- • procedures: manipulation
- • diagnosis: cervical; thoracic
- • 2/14/05
  - • objective findings: right lumbar spasms
  - • procedures: manipulation
  - • diagnosis: lumbar; thoracic; cervical
- • 3/05
  - • procedures: manipulation
  - • diagnosis: lumbar; thoracic

**Progress Notes, Belington Comm. Med., 7/3/02 - 10/14/02 (Tr. 271-72)**
- • 7/3/02
  - • MRI L spine due to back pain; leg numbness
- • 9/26/02
  - • subjective: low back pain; no relief; unable to work; illegible
  - • objective: illegible
  - • assessment: lumbar disc
  - • plan: physical therapy
- • 10/14/02
  - • subjective: still in physical therapy; no change in pain
  - • objective: illegible
  - • assessment: lumbar disc
  - • plan: continue PT; illegible

**Myelogram/CT scan report, Dr. Weinstein, 9/5/02 - 9/18/02 (Tr. 253-55)**
- • Letter from Dr. Weinstein, 9/5/02: found little decrease in left ankle jerk; straight-leg raising is basically negative; dis bulge at 4-5; order myelogram/CT scan
- • Lumbar Myelogram and CT scan results: no focal disc protrusion, spinal stenosis, or gross nerve root impingement. No neurologic impingement seen.
- • Letter from Dr. Weinstein 9/18/02: myelogram/CT scan is negative, but opines he has mild compression effects at 4-5 on the left. Not enthusiastic about operating; recommending exercises and walking

**Back Evaluation, Dr. High, Health Works, 9/30/02 (Tr. 264-70)**
- • subjective: pain mostly in back and lateral-posterior thighs; sitting and walking increases pain
- • objective: slow movement
- • treatment location: lumbar
- • assessment: patient requires PT to decrease pain and increase lumbar stability and functional movement
- • plan: visits twice/week for 6 weeks; exercises to increase stability and strength in lumbar

**Progress Notes, Health Works, 10/4/02 - 10/22/02 (Tr. 256-63)**
- • 10/4/02

- subjective: sore back
- objective: continued all current exercises
- treatment location: lumbar
- assessment: patient continues to have pain to lumbar area; tolerated progression of exercise
- plan: continue progression of exercise
- 10/8/02
  - subjective: no change in current status of lumbar pain; fatigues easily
  - objective: continued current exercise program
  - treatment location: lumbar
  - assessment: no significant improvement
  - plan: assess and progress as indicated
- 10/11/02
  - subjective: no change; can go up stairs without difficulty; difficulty going down stairs; difficulty with prolonged walking and standing
  - objective: continued current exercises
  - treatment location: lumbar
  - assessment: pain is limiting progress
  - plan: continue to working on decreasing pain and increasing activity
- 10/14/02
  - subjective: pain in lumbar area; difficulty with prolonged walking and sitting
  - treatment program: lumbar stretching and mobility exercises
  - recommendations: continue PT
- 10/16/02
  - subjective: hips and back are sore; saw doctor - told to continue PT for another 30 days
  - objective: continued prescribed exercises; continue to use cane for ambulatory purposes
  - treatment location: lumbar
  - assessment: ambulating improved posture
- 10/18/02
  - subjective: back pain; steps are easier but they make his legs tired
  - objective: continued all current exercises
  - treatment location: lumbar
  - assessment: no significant change

**Medical Records, Richard Douglas, M.D., West Virginia Neurosurgery & Spine Center, 12/16/02-2/4/03 (Tr. 301-10)**
New Patient Office Consultation 12/16/02
- medical decision making and review of diagnostic studies: somewhat suspicious for a herniated disc on left at L4-5 and a central and left sided herniated disc at L5-S1; suspicious for a left L4-5 herniation and a central and left herniation at L5-S1
- diagnosis: low back pain; left leg pain; suspicious for herniated disc on left at L4-5 and a central and left herniated disc at L5-S1

- recommendations and plan: MRI of lumbar spine; pain management

Return Office Visit 1/17/03
- review of diagnostic studies: MRI dated 1/10/03 L1-2, L2-3 show no focal disc herniation; central canal stenosis at L3-4; no evidence of disc herniation or central canal stenosis seen; L4-5 diffuse disc bulge with asymmetric towards left with mild to moderate central canal stenosis; L5-S1 no focal disc herniation
- recommendations and plan: referral to pain management for epidural steroid injection; CT of pelvis; total body bone scan

Return Office Visit 2/4/03
- review of diagnostic studies: total body bone scan is unremarkable; CT of pelvis reveals 2 mm kidney stone with no evidence of proximal obstruction; re-review of MRI of lumbar myelogram reveals no evidence of focal disc protrusion, spinal stenosis or gross nerve root impingement; MRI of lumbar spine reveals left paracentral disc herniation at L4-5
- recommendations and plan: proceed with upcoming pain management; return to clinic following completion of pain management


**Medical Records, St. Joseph's Medical Plaza, Dr. Khan, 12/24/02 - 3/17/03 (Tr. 329-36 & 370-93)**
- 12/24/02
  - impression: back pain; suspect lower lumbosacral spine strain; not taking Naprosyn; not even taking Flexeril; only taking amitriptylene on an as needed basis
  - plan: take amitriptylene, celebrex; continue paxil; advised PT
- 1/24/03
  - back pain is feeling better; chest and cardiac exam is normal; no edema
- 4/25/03
  - back pain is much better; chest is clear; cardiac exam is normal; no edema; no spinal tenderness
- 7/17/03
  - back pain is much improved; no spinal tenderness; no neurological deficit; has pain and numbness in legs off and on
- 12/11/03
  - chest pain due to pulling and pushing; costochodral discomfort consistent with costochondritis; back pain has resolved since his surgery
- 12/23/03 Radiology Report
  - chest exam
  - findings: no abnormalities of the heart, lungs, mediastinum or bones; lungs are fully expanded and there is no evidence of an infiltrate or effusion; cardiac silhouette is within normal limits
- 12/23/03
  - continuing chest pain; CAT scan and chest x-ray show nothing; reproducible discomfort in low costochondral margin on the left side; no radicular character to the pain

- 5/13/04
  - 6 month check-up; back pain; medicine from pain clinic made him tired; lower lumbosacral spine discomfort; straight-leg raising is positive; no neurological deficit or radiculopathy; high cholesterol; gained weight; high risk for heart disease
- 6/14/04
  - some back pain, but improved; chest and cardiac exam is normal
- 9/14/04
  - objective: neck stiff; CV RRR murmur gallop-edema; GI/Abdomen masses tender organomegaly hernia; head/neck back upper ext lower ext - mild L5 discomfort; skin macule papule nodule patch plaque; back pain
  - assessment: back pain
  - plan: medications
- 12/14/04
  - subjective: going to pain clinic
  - objective: lower L5 mild discomfort; back pain
  - assessment: illegible
  - pain: back pain; pain clinic

**United Hospital Center, MRI Lumbar Spine, Dr. Douglas, 1/10/03 (Tr. 303-04)**
L1-2, L2-3: no focal disc herniations or central canal or neural foraminal stenosis
L3-4: no focal disc herniation; central canal and neutral foramina are patent
L4-5 diffuse disc bulge, asymmetric towards left versus small central to left paracentral disc herniation; mild to moderate central canal stenosis secondary to superimposed facet and ligamentum flavum hypertrophy; no significant narrowing
L5-S1: no focal disc herniation to be seen
Impression: disc desiccation with an asymmetric disc bulge versus small left paracentral disc herniation at L4-5 effacing the ventral thecal sac and probably impinging upon exiting nerve; mild to moderate central canal stenosis without significant foraminal stenosis

**Colonoscopy Records, St. Joseph's Hospital, Dr. Pearson, 2/3/03 - 3/5/03 (Tr. 311-15)**
- 2/3/03 Visit
  - chief complaint: family history of colon cancer
  - assessment: extensive family history of colon cancer
  - plan: colonoscopy
- 2/25/03 Operative Report
  - postoperative diagnosis: extensive family history of colon cancer
  - findings: no evidence of any masses, polyps, or diverticulosis; essentially normal examination
  - plan: follow up in one week
- 3/5/03 Visit
  - plan: repeat in 3 years

**Initial Consult, History and Physical, Mona Justo, M.D., 3/3/03 (Tr. 316-28)**

- impression: lumbar radiculopathy; herniated disc at L4-5; mild spinal stenosis; facet arthropathy; myofascial pain
- recommendations: consider performing a diagnostic/therapeutic epidural steroid injection

## Medical Records, United Pain Management, 4/9/03-6/5/03 (Tr. 482-502)
- 4/9/03
  - assessment: low back and left leg pain
  - plan: ESI x2
- 4/15/03 lumbar epidural steroid injection
  - exam: DX fluoro guide/inj spine
  - order diagnosis: low back pain
- 4/30/03
  - assessment: illegible
  - plan: illegible
- 4/30/03 trigger point injection
- 5/8/03
  - exam: DX fluoro guide/inj spine
  - order diagnosis: low back pain
- 6/4/03
  - chief complaint: left leg and low back pain
  - assessment: illegible
  - plan: ESI #4, illegible
- 6/5/03
  - exam: DX fluoro guide/inj spine
  - order diagnosis: back pain

## Operation Record, United Hospital Center, Dr. Douglas, 9/17/03 (Tr. 505-06)
- preoperative diagnosis: left L4-5 herniated disc with left L5 radiculopathy
- postoperative diagnosis: left L4-5 herniated disc with left L5 radiculopathy

## History and Physical Exam, United Hospital Center, Dr. Douglas, 9/22/03 (Tr. 503-04)
- impression: left L4 radiculopathy secondary to herniated disc on the left at L4-5
- recommendations/plan: proceed with surgery

## Medical Records, Richard Douglas, M.D., West Virginia Neurosurgery & Spine Center, 2/10/04-1/24/06 (Tr. 513-19)
- 2/10/04
  - review of diagnostic studies: CT of chest reveals normal chest; CT of abdomen is normal
  - recommendations and plan: standing AP and lateral lumbosacral x-rays; pain management for possible trigger point injections
- 5/24/04
  - review of diagnostic studies: x-rays of lumbar spine reveals no evidence of instability; MRI of lumbar spine with and without gadolinium reveals epidural

fibrosis on left; no evidence of recurrent disc herniation
- • recommendations and plan: do not recommend surgery; continue pain management; massage therapy
- • 12/27/05
  - • recommendations and plan: MRI of lumbar spine; total body bone scan; standing AP and lateral lumbosacral x-rays
- • 1/24/06
  - • review of diagnostic studies: MRI of lumbar spine reveals no significant neural encroachment stenosis; no evidence of recurrent disc herniation; total body bone scan reveals no significant abnormal increased activity; x-rays of lumbar spine reveals degenerative changes
  - • recommendations and plan: no surgery; continue conservative management

**Medical Records, United Hospital Center, Dr. Labatia, 2/24/04-5/13/05 (Tr. 427-58)**
- • 2/24/04
  - • chief complaint: axial lower back pain
  - • assessment: back pain appears to be mostly discogenic in nature
  - • plan: left L4 and L5 transforaminal nerve root blocks for L4-5 discogenic pain; continue home exercise program
- • 4/7/04
  - • preoperative diagnosis: lumbar intervertebral disc displacement
  - • postoperative diagnosis: lumbar intervertebral disc displacement
  - • operation: transforaminal left L4 and L5 nerve root blocks under fluroscopy
- • 4/29/04
  - • subjective: improved pain in left lower back; recent radiating pain down to left calf for last 2 weeks; tingling across left toes; left lower extremity pain is worse than left lower back pain; back pain not too bad with sitting or standing
  - • objective: some tenderness in left lumbar paraspinal area; more pain with extension and lateral rotation of lumbar spine; straight leg raise test was negative bilaterally
  - • assessment: left lower extremity radiating pain is new in onset; left lower back pain appears to be secondary to facet joint pain syndrome
  - • plan: MRI; recommend left L3-4, L4-5, and L5-S1 facet joint cortisone injections
- • 5/11/04
  - • lumbar spine magnetic resonance imaging without and with IV contrast
  - • findings: unchanged normal alignment on sagittal images; mild narrowing of L4-5 disc accompanied with mild decrease in signal on T2 weighted images, indicating desiccation; no apparent encroachment upon exiting left L4 nerve root; no significant central spinal canal stenosis
  - • impression: presence of enhancing scar tissue at L4-5 level on left side without evidence of recurrent focal disc herniation
- • 6/23/04
  - • preoperative diagnosis: lumbar spondylosis without myelopathy
  - • postoperative diagnosis: lumbar spondylosis without myelopathy

- 7/20/04
    - subjective: pain is recurring to its preinjection level; denies any radiating pain down the lower extremities; denies numbness or tingling in lower extremities; left lower back pain is constant and is mostly with standing
    - objective: normal lordosis; mild to moderate tenderness in left lumbar paraspinal area; straight leg raise test is negative bilaterally; neurological exam is stable
    - plan: recommended radiofrequency ablation denervation of left lower lumbar facet joints; following radiofrequency ablation procedure, refer patient to PT
- 8/18/04
    - preoperative diagnosis: lumbar spondylosis
    - postoperative diagnosis: lumbar spondylosis
- 10/15/04
    - vertebral bodies and disk spaces are normal; no evidence of spondylolysis or spondylolisthesis; no fracture
    - impression: normal lumbar spine
- 10/15/04
    - subjective: almost complete resolution of left-sided lower back pain; new onset of right-sided lower back pain; denies any radiating pain down lower extremities; no numbness, tingling, or weakness in lower extremities
    - objective: tenderness mostly over the right lower lumbar paraspinal area and over midline; more pain with extension; neurological examination in normal limits
    - plan: recommended AP lateral and oblique views of lumbosacral spine
- 11/4/04
    - subjective: recurrent pain symptoms especially with regards to radiating pain down left lower extremity mostly in posterior thigh area and posterolateral aspect of left lower leg; left lower back pain has slightly got worse although it's not as bad as it was before; denies any weakness in lower extremities; some numbness and tingling in left foot
    - objective: tenderness mostly in midline over his midline scar; no tenderness in paraspinal areas; more pain with extension; neurological exam in normal limits with no motor or sensory deficits
    - plan: repeat MRI of lumbar spine
- 11/21/04
    - MRI lumbar spine
    - impression: no change in post-surgical scar at L4-5 level with only mild distortion of thecal sac and partial approximationi to left L5 nerve root
- 1/10/05
    - subjective: constant left lower back pain radiating down the left lower extremity; difficulties with sleeping; denies significant numbness or tingling in lower extremities
    - objective: tenderness mostly over left lower lumbar joints; mild tenderness in the midline; no tenderness over right paraspinal area; more pain with extension; neurological exam in normal limits with no motor or sensory deficits in the lower extremities

- plan: repeat RFA denervation of left lumbar facet joints
- 2/9/05
  - preoperative diagnosis: lumbar spondylosis without myelopathy
  - posteroperative diagnosis: lumbar spondylosis without myelopathy
- 2/17/05
  - subjective: dull achine pain over entire aspect of left lower extremity especially in lateral aspect of thigh and lower leg; denies any weakness in lower extremities
  - objective: midline vertical scar from previous surgery; tenderness mostly in the midline area and no tenderness over paraspinal areas; neurological exam is within normal limits with no motor or sensory deficits in the lower extremities
  - assessment: arthralgias in multiple joints including the knees, ankles, and elbows; peripheral neuropathy specifically peroneal nerve palsy cannot be ruled out
  - plan: recommended diagnostic and therapeutic transforaminal left L5 and S-1 nerve root blocks for possible raidulitis secondary to scar tissue
- 3/9/05
  - preoperative diagnosis: lumbosacral radiculitis
  - postoperative diagnosis: lumbosacral radiculitis
- 3/15/05
  - subjective: no change in left lower back pain following epidural blocks; radiating burning pain in the left lower extremity is worse than left lower back pain; left lower back pain is mostly in left posterior hip region; feels arthritic pains in joints including ankles, knees and elbows; denies numbness or tingling in lower extremities; some weakness in left lower extremity
  - objective: diminished left ankle
  - plan: pulsed radiofrequency ablation of left L-5 nerve root
- 4/25/05
  - summary: motor and sensory nerve conduction study in the LLE shows normal distal latencies, conduction velocities and amplitudes; EMG needle exam in key root muscles in the LLE and left lumbar paraspinals shows no denervation potentials, normal motor unit amplitudes and durations, no polyphasics, normal recruitment pattern and activation rate
  - conclusion: no electromyographic evidence of: peripheral neuropathy in LLE, lumbar radiculopathy from L3 to S1, peroneal nerve palsy
- 5/10/05
  - subjective: low back pain radiating down left lower extremity mostly over the lateral aspect of the lower leg and overall his left lower extremity pain continues to be more bothersome than his lower back pain; denies any significant weakness in lower extremities
  - objective: equal pain with flexion and extension; straight leg raise test is negative bilaterally on sitting and supine; no motor deficits in lower extremities
  - plan: diagnostic and therapeutic block to his left S1 joint
- 5/13/05
  - preoperative diagnosis: left sacroiliac arthropathy
  - postoperative diagnosis: left sacroiliac arthropathy

**Medical Records, University of Virginia Health System, Dr. Helm, 5/31/05-6/23/05 (Tr. 467-72)**

- <u>5/31/05</u>
  - letter to Dr. Labatia: some numbness in dorsum of the foot on left side, but his strength is normal; straight leg raising test is negative
- <u>6/21/05</u>
  - full result: lumbar myelogram
  - post myelographic lumbar CT findings:
    - L2-3: no evidence of disk bulge, neuroforaminal narrowing, or central canal stenosis
    - L3-4: no evidence of disk bulge, neuroformainal narrowing, or central canal stenosis
    - L4-5: evidence of a prior left sided hemilaminectomy and partial facetectomy at L4-5 level. Small central disk protrusion without evidence of significant neuroforaminal narrowing or central canal stenosis
    - L5-S1: no evidence of disk bulge, neuroformainal narrowing, or central canal stenosis
  - impression: status post L4-5 left sided hemilaminectomy with a small central disk protrusion at this level which does not produce significant central canal stenosis or neuroforaminal narrowing
- <u>6/23/05</u>
  - letter to Dr. Labatia: no evidence of nerve root compression

**Medical Records, St. Joseph's Medical Plaza, Dr. Khan, 4/28/05-6/27/06 (Tr. 527-41)**

- <u>4/28/05</u>
  - subjective: low back and left leg pain; something stuck in throat
  - objective: back pain
  - assessment: illegible
  - plan: back pain - pain clinic
- <u>6/6/05</u>
  - subjective: low back pain, left leg pain
  - objective: L5 mild discomfort; back pain
  - assessment: back pain - Univ. of Virginia
  - plan: illegible
- <u>5/23/06</u>
  - subjective: tired, no energy
  - objective: fatigue, weakness
  - assessment: back pain - pain clinic
  - plan: illegible
- <u>6/14/06</u>
  - subjective: excessive fatigue, sleeps constantly
  - objective: fatigue
  - assessment: fatigue

- • plan: back pain; illegible
- • 6/21/06
  - • subjective: no changes in fatigue
  - • objective: fatigue
  - • assessment: fatigue - improved
  - • plan: back pain, UHC

**Operation Records, United Hospital Center, Dr. Labatia, 8/23/05-8/7/06 (Tr. 520-26 & 542-51)**
- • 8/23/05
  - • subjective: low back pain radiating down left lower extremity; no weakness in lower extremities; increasing restlessness; difficulty sleeping
  - • objective: localized tenderness over left lower lumbar paraspinal area over the facet joints; straight leg raise test is negative bilaterally; no motor or sensory deficits in lower extremities
  - • assessment: pain down left lower extremity is most likely mechanical secondary to lumbar facet joint syndrome; no evidence of nerve root compression
  - • plan: repeat left lower lumbar facet joint blocks
- • 2/1/06
  - • preoperative diagnosis: lumbar spondylosis
  - • postoperative diagnosis: lumbar spondylosis
- • 2/16/06
  - • subjective: left lower back pain radiating down left lower extremity; continuing radiating pain down posterior aspect of left thigh and calf; denies any lower extremity weakness; continues to have tremors in left lower extremity
  - • objective: flexion of 80 degrees and extension 30 degrees; slightly more pain during flexion; straight leg raise test is negative bilaterally
  - • assessment: constant radiating pain down left lower extremity most likely a residual radicular pain from his lumbar spine
  - • plan: FRA denervation of left lumbar facet joints
- • 4/26/06
  - • preoperative diagnosis: lumbar spondylosis
  - • postoperative diagnosis: lumbar spondylosis
- • 6/8/06
  - • subjective: continues to have cramps in left calf area and left posterior thigh; denies any numbness or weakness in lower extremities
  - • objective: 90 degrees flexion and 30 degrees extension; slightly more pain during extension; straight leg raise test is negative; neurological exam is within normal limits
  - • assessment: 50% relief of pain following RFA denervation of left lower lumbar facet joints
  - • plan: continue current pain medications; continue home exercise program
- • 7/20/06
  - • subjective: low back and left lower extremity pain worsening; difficulty sleeping;

denies any numbness, tingling, or weakness in lower extremities
- objective: flexion of 80 degrees and extension 20 degrees; more pain during flexion; straight leg test is negative for SI joint pain; neurological exam showed no motor deficits in both lower extremities
- assessment: shows mostly discogenic type of pain
- plan: consider morphine pump
- 8/7/06
  - preoperative diagnosis: left trochanteric bursitis
  - postoperative diagnosis: left trochanteric bursitis
  - procedure: left trochanteric bursa cortisone injection

**Medical Record, Oncology/Hematology Associates, Dr. Brager, 11/30/05 (Tr. 507-12)**
- chief complaint: papillary thyroid cancer, 1-cm, right lobe, status post resection
- impression: early stage I papillary thyroid cancer, 1cm; depression; elevated cholesterol; degenerative arthritis; nephrolithiasis

**Physical Residual Functional Capacity Assessment, DDS Physician, 12/13/02 (Tr. 275-83)**
- Exertional Limitations
  - occasionally lift: 20 pounds
  - frequently lift: 10 pounds
  - stand and/or walk (with normal breaks) for a total of: about 6 hours
  - sit (with normal breaks) for a total of: about 6 hours
  - push and/or pull: unlimited
- Postural Limitations
  - climbing ramp/stairs: occasionally
  - climbing ladder/rope/scaffolds: occasionally
  - balancing: occasionally
  - stooping: occasionally
  - kneeling: occasionally
  - crouching: occasionally
  - crawling: occasionally
- Manipulative Limitations: none
- Visual Limitations: none
- Communicative Limitations: none
- Environmental Limitations
  - extreme cold: avoid concentrated exposure
  - extreme heat: unlimited
  - wetness: unlimited
  - humidity: unlimited
  - noise: unlimited
  - vibration: unlimited
  - fumes, odors, dusts, gases, poor ventilation: unlimited
  - hazards: unlimited
- Symptoms: client still hurts; does woodworking 2-3 times/week; mild degeneration disc

**Psychological Evaluation, Martin Levin, M.A., 12/20/02 (Tr. 284-85)**
- general observations: pleasant and cooperative; posture normal; gait was slow; walked with a cane
- chief complaints: pain in legs and spine; often loses balance; pinched nerve in back and a bulging disc; not working
- presenting symptoms: serious pain in back; being around people is difficult; sleep is poor; gaining weight; depressed mood and sad; no crying spells or suicidal ideation; no obsessive compulsive symptoms
- mental treatment history: no involvement in mental health system
- mental status exam:
  - appearance: neat and appropriately dressed and groomed
  - attitude/behavior: pleasant and cooperative
  - social: good eye contact and behaved in a socially appropriate manner
  - speech: normal tones and adequate communication skills
  - affect: broad
  - thought process: no abnormalities
  - thought content: no abnormalities
  - immediate memory: average
  - recent memory: markedly deficient
  - remote memory: average
  - concentration: average
  - persistence: average
  - pace: average
- diagnosis:
  - Axis I            293.83 mood disorder due to back pain; depressed
  - Axis II           no conditions present
  - Axis III          back pain, asthma, allergies, all as reported by Claimant
- prognosis: fair

**Psychiatric Review Technique, Dr. Ramon 1/8/03 (Tr. 286-300)**
- Medical Summary:
  - Medical Disposition: impairment not severe
  - categories upon which disposition is based: 12.04 affective disorders
    - mood disorder
- Rating of Functional Limitations
  - restriction of activities of daily living: mild
  - difficulties in maintaining social functioning: mild
  - difficulties in maintaining concentration, persistence, or pace: mild
  - episodes of decompensation, each of extended duration: none

**Physical Residual Functional Capacity Assessment, Dr. Brown, 5/6/03 (Tr. 337-44)**
- Exertional Limitations

- • occasionally lift: 20 pounds
- • frequently lift: 10 pounds
- • stand and/or walk (with normal breaks) for a total of: about 6 hours
- • sit (with normal breaks) for a total of: about 6 hours
- • push and/or pull: unlimited
- • Postural Limitations
  - • climbing ramp/stairs: occasionally
  - • climbing ladder/rope/scaffolds: occasionally
  - • balancing: occasionally
  - • stooping: occasionally
  - • kneeling: occasionally
  - • crouching: occasionally
  - • crawling: occasionally
- • Manipulative Limitations: none
- • Visual Limitations: none
- • Communicative Limitations: none
- • Environmental Limitations: none
- • Symptoms:
  - • considered degree of subjective pain which seems excessive in view of the objective findings
  - • neurologic exam does not reveal any significant deficits; should tolerate light work activity

## West Virginia Disability Determination Service Mental Assessment, Dr. Morgan, 4/25/05 (Tr. 394-99)

- • assessments completed: mental status examination; clinical interview
- • presenting symptoms: past history of recurrent depression; reported symptoms of anhedonia; social withdrawal; back and leg pain make it difficult for him to fall asleep and maintain sleep; sleep pattern is currently variable
- • mental status examination: good hygiene and grooming; cooperative and compliant; spontaneity was adequate; length and depth of verbal responses were appropriate; demeanor depicted extroversion; relevant and coherent speech; depressed mood and displayed a mild level of anxiety; restricted affect; no symptoms of psychosis; insights were mildly deficient; no signs or symptoms of suicidal or homicidal ideation; judgments and immediate recall within normal limits; concentration was mildly deficient
- • subjective symptoms: depression; diminished attention and concentration; symptoms of anhedonia and social withdrawal; feelings of guilt and irritability; difficulty sleeping; crying spells; diminished energy level; reported history of transient suicidal ideations
- • objective symptoms: cooperative and complaint; rigid posture; normal gait; depressed mood; restricted affect; appeared tense; immediate and recent recall were within normal limits; remote recall was adequate; concentration was mildly deficient; low average to average range of intelligence
- • diagnostic impressions:
  - • Axis I          296.32 major depressive disorder, recurrent, moderate

> 303.90 alcohol dependence, without physiological dependence in remission
- Axis II        V71.09 no diagnosis
- Axis III          reported bulging disks in back; back pain; hyperlipidemia
- prognosis: poor
- concentration: mildly deficient
- persistence: mildly deficient
- pace: moderately deficient
- immediate memory: within normal limits
- recent memory: within normal limits

## Psychiatric Review Technique, Dr. Kuzniar 5/2/05 (Tr. 400-13)
- Medical Summary:
  - Medical Disposition: FRC assessment necessary
  - categories upon which disposition is based: 12.04 affective disorders
    - depressive syndrome characterized by at least four of the following: anhedonia or pervasive loss of interest in almost all activities; sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking
- Rating of Functional Limitations
  - restriction of activities of daily living: mild
  - difficulties in maintaining social functioning: moderate
  - difficulties in maintaining concentration, persistence, or pace: moderate
  - episodes of decompensation, each of extended duration: none
- Notes: poor concentration; pain due to back problems; short-tempered

## Mental Residual Functional Capacity Assessment, Dr. Kuzniar, 5/2/05 (Tr. 414-17)
- understanding and memory:
  - ability to remember locations and work-like procedures: no evidence of limitation
  - ability to understand and remember very short and simple instructions: no evidence of limitations
  - ability to understand and remember detailed instructions: not significantly limited
- sustained concentration and persistence:
  - ability to carry out very short and simple instructions: no evidence of limitation
  - ability to carry out detailed instructions: not significantly limited
  - ability to maintain attention and concentration for extended periods: moderately limited
  - ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances: moderately limited
  - ability to sustain an ordinary routine without special supervision: no evidence of limitation
  - ability to work in coordination with or proximity to others without being distracted by them: moderately limited
  - ability to make simple work-related decisions: no evidence of limitation

- ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods: moderately limited
- social interaction:
  - ability to interact appropriately with general public: not significantly limited
  - ability to ask simple questions or request assistance: no evidence of limitation
  - ability to accept instructions and respond appropriately to criticism from supervisors: not significantly limited
  - ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes: moderately limited
  - ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: no evidence of limitation
- adaption:
  - ability to respond appropriately to changes in work setting: not significantly limited
  - ability to be aware of normal hazards and take appropriate precautions: no evidence of limitation
  - ability to travel in unfamiliar places or use public transportation: not significantly limited
  - ability to set realistic goals or make plans independently of others: not significantly limited
- functional capacity assessment: capacity to understand, remember, and carry out 1-3 step instructions within a low social interaction demand work setting

**West Virginia Disability Determination Service, Disability Determination Exam, Dr. Orvik, 5/3/05 (Tr. 418-26)**
- chief complaint: back pain; had surgery in 2002; 6 months after surgery had back pain again; left leg pain; history of hyperlipidemia and also mild hearing problem
- general appearance and pertinent behavior: normal general appearance
- conclusions and opinions/ diagnoses and impressions: low back pain with history of L4-L5 partial diskectomy; severe left leg pain; hyperlipidemia; depression; possible mild hearing loss; mild exogenous obesity
- summary of major complaints and gross physical findings: major complaint is back pain and left leg pain; significant positive straight leg raise test, particularly in the left leg; evidence of mild atrophy of left thigh and left calf muscles
- pain and limitations: sitting; walking; lifting; traveling long distances

**Physical Residual Functional Capacity Assessment, Dr. Pascasio, 5/18/05 (Tr. 459-66)**
Exertional Limitations
- occasionally lift: 50 pounds
- frequently lift: 25 pounds
- stand and/or walk (with normal breaks) for a total of: about 6 hours
- sit (with normal breaks) for a total of: about 6 hours
- push and/or pull: unlimited

- Postural Limitations
  - climbing ramp/stairs: occasionally
  - climbing ladder/rope/scaffolds: occasionally
  - balancing: frequently
  - stooping: frequently
  - kneeling: frequently
  - crouching: frequently
  - crawling: frequently
- Manipulative Limitations: none
- Visual Limitations: none
- Communicative Limitations:
  - hearing: limited
  - speaking: unlimited
- Environmental Limitations:
  - extreme cold: avoid concentrated exposure
  - extreme heat: unlimited
  - wetness: unlimited
  - humidity: unlimited
  - noise: unlimited
  - vibration: unlimited
  - fumes, odors, dusts, gases, poor ventilation: unlimited
  - hazards: avoid concentrated exposure
- Symptoms:
  - appears Claimant is credible
- treating or examining source statements
  - are treating/examining source conclusions about claimant's limitations or restrictions which are significantly different
  - 5/3/05: Dr. Orvik: problems with sitting for extended periods of time would make it difficult for him to do a sedentary job. I disagree. None of his physical findings would support the contention that his sitting capability is impaired. His strength of extremities except left leg at 4/5 are all within normal limits; therefore, he should be able to perform a medium type of work.

**Physical Residual Functional Capacity Assessment, Dr. Lateef, 9/20/05 (Tr. 473-80)**
- Exertional Limitations
  - occasionally lift: 20 pounds
  - frequently lift: 10 pounds
  - stand and/or walk (with normal breaks) for a total of: about 6 hours
  - sit (with normal breaks) for a total of: about 6 hours
  - push and/or pull: unlimited
- Postural Limitations
  - climbing ramp/stairs: occasionally
  - climbing ladder/rope/scaffolds: never
  - balancing: occasionally

- • stooping: occasionally
- • kneeling: occasionally
- • crouching: occasionally
- • crawling: occasionally
- Manipulative Limitations: none
- Visual Limitations: none
- Communicative Limitations: none
- Environmental Limitations:
  - • extreme cold: avoid concentrated exposure
  - • extreme heat: unlimited
  - • wetness: unlimited
  - • humidity: unlimited
  - • noise: unlimited
  - • vibration: avoid concentrated exposure
  - • fumes, odors, dusts, gases, poor ventilation: unlimited
  - • hazards: avoid all exposure
- Symptoms:
  - • c/o low back pain credible

**Medical Assessment of Ability to do Work-Related Activities (Physical) Dr. Labatia 9/19/06 (Tr. 552-54)**
- lifting/carrying affected by impairment?  Yes
  - • maximum occasional: 10 lbs
  - • maximum frequently: negligible
- standing/walking affected by impairment?  Yes
  - • total hours in 8-hour workday: 1-2 hours
  - • without interruption: 20-30 minutes
- sitting affected by this impairment?  Yes
  - • total hours in 8-hour workday: 2-4 hours
  - • without interruption: 30-45 minutes
- climbing: occasionally
- balancing: occasionally
- stoop: never
- crouch: never
- kneel: never
- crawl: never
- physical functions affected:
  - • reaching: no
  - • handling: no
  - • feeling: no
  - • pushing/pulling: yes
  - • seeing: no
  - • hearing: no
  - • speaking: no

- environmental restrictions:
  - heights: yes
  - moving machinery: yes
  - temperature extremes: no
  - chemicals: no
  - dust: no
  - noise: no
  - fumes: no
  - humidity: no
  - vibration: yes

D.    <u>Testimonial Evidence</u>

Testimony was taken at the hearing held on March 21, 2007.  The following portions of

the testimony are relevant to the disposition of the case:

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q    What is your date of birth?
A    5/7/61.
Q    And how old are you today?
A    45.
Q    And how tall are you?
A    5'10".
Q    And how much do you weigh today?
A    220.
Q    The record indicates that you - - 236.  Have you lost the weight?
A    Yep.
Q    Is that related to any of your conditions that you want me to know about?
A    I just don't eat very much anymore.

                   *         *         *

Q    Do you have a driver's license in West Virginia?
A    Yes, sir.
Q    Are you able to drive?
A    For a short period.
Q    And what limits your driving?
A    I just get tired, and my hip hurts, and my back hurts, and I just don't drive very
far.
Q    How did you get to the hearing this morning there in Bridgeport?
A    My wife drove me.
Q    How long did it take you?
A    30 minutes.
Q    Did you have any difficulty riding in a car for 30 minutes?
A    Yeah.

| | |
|---|---|
| Q | What problems did you have? |
| A | Just uncomfortable. |
| Q | Did you have to stop? |
| A | No. |
| Q | How far did you go in school? |
| A | 12th grade. |
| Q | Did you have any courses after 12th grade? |
| A | No, sir. |
| Q | Are you able to read? |
| A | Yep. |
| Q | Can you write? |
| A | Yeah. |
| Q | Can you count money, and make change, and buy things? |
| A | Yeah. |
| Q | Any other training after high school? |
| A | No, sir. |
| Q | Any military? |
| A | No, sir. |
| Q | When did you last work at any job for wages? |
| A | Probably six months before my surgery and I can't remember the date, I think it was. |
| Q | Well in your, in your application you said you became disabled June the 18th of '02. |
| A | Yeah. |
| Q | Were you working at that time? |
| A | Yes, sir. |
| Q | All right.  And you said - - when did you have surgery? |
| A | I don't remember the exact date. |
| ALJ | Counsel, do you have any - - |
| ATTY | Your Honor, I, I thought it was the end of, let's see, - - |
| CLMT | You got - - |
| ATTY | - - September 16th of '03 is what - - |
| CLMT | Yeah. |
| ATTY | - - I saw at one point here in the file.  Does that sound right to you? |
| ALJ | When you made - - |
| CLMT | It's pretty close. |

BY ADMINISTRATIVE LAW JUDGE:

| | |
|---|---|
| Q | - - application for disability do you remember telling them when you last worked? |
| A | No, sir.  I don't. |

*      *      *

| | |
|---|---|
| Q | Did you work anywhere for cash? |
| A | No. |
| Q | You do any volunteer work? |
| A | No. |

Q       I want to cover your work history, I want to go back 15 years if you've got that many years of employment.

A       Yes, sir.

Q       What were you doing when you last worked?

A       Timber cutter.

Q       How many years would you say you were a timber cutter?

A       I think it go back clear to 15 years.

Q       During part of that period were you self-employed?

A       Yes, sir.

Q       You had your own company?

A       Yes, sir.

Q       Was it a corporation or you just did it in your own name?

A       Just done it in my own name.

Q       Were you cutting timber yourself?

A       Yeah.

Q       Okay.  And would you say all of your work has been a timber cutter?

A       I worked at a saw mill for maybe four or five years.

Q       Was that your saw mill?

A       No.

Q       What did you do at the saw mill that was different from timber cutting?

A       Just labor, just - -

Q       Give me some idea of how heavy that was for you, what was the heaviest part of that work?

A       Oh. Railroad ties probably weigh 150 pounds and you had to flip the ends of them over.

Q       On the cutting of the timber what was the heaviest part of that job?

A       Chain saw.

Q       After you cut the tree did you have any responsibilities for removing it and getting it either on a truck, or a skid, or something?

A       No.  I'd help hook cables and the chains.

Q       All right.  I'm showing that you're a skilled carpenter.  Did you do any carpentry work during this period of time?

A       No.

Q       No work as a carpenter?

A       No.

Q       The record indicates from June of '94 to July of '95 you were, in fact, a carpenter and had earnings - -

A       No.

Q       - - as a carpenter.  Did you work for somebody as a carpenter or - -

A       Not that I remember.

Q       All right.  Did you work on a survey crew or on construction?

A       I did do that.  Yes, sir.

Q       All right.  And how long did you do that work?

A       Maybe six months.

Q       What were you doing for the survey crew?

A       Just holding the rod, they just called me a rod man; I'd hold the rod for the surveyor to take a shot.

Q       What was the heaviest part of being a survey rod man?

A       Carrying a whole pack of stakes on your back.

Q       Walking for distances?

A       No.  Yeah.

Q       Were you climbing hills and slopes?

A       Yep.

Q       Okay.  Okay.  But then I'm showing in '90 - - '91 to '94 the saw mill would that be the mill hand work, and the skidder operator, and a truck driver?

A       Yes, sir.

Q       Did you also operate a dozer at any time during this period?

A       A small amount.  Just I would - -

Q       Okay.

A       - - maybe a month total is - - that's all the time I worked there running a dozer.

*               *               *

Q       - - at that time?  Any other work in your past 15 years to - - I'm showing that maybe four or five months you trimmed trees.

A       Yes, sir.  That was - - I did - - during the wintertime I'd trim trees whenever I'd get home early from my timber job.

Q       Okay.  And that was the - - for people, or - -

A       It was - -

Q       - - individuals, or - -

A       - - in the neighborhood there.

Q       Neighborhood?

A       Um-hum.

Q       And did you have a bucket truck to operate, or did you climb the tree, how did you trim it?

A       Climb the tree.

Q       Okay.  Any other work you've done in the past 15 years?

A       Not that I can think of.

Q       And you haven't worked since 2002 for wages?

A       That's right.

Q       My review of your file indicates that you had back surgery in '03, is that correct?

A       Yeah.

Q       Have you had any surgery since that time?

A       I had my thyroid taken out.

Q       All right.  When was that taken out?

A       Last year about this time.

Q       '05?

A       Yeah.

Q       So do you take thyroid medication?

A       Yes, sir.

Q       All right.  When you signed up for disability though you said you were disabled because of your back, and depression, and cholesterol.  What's wrong with your nerves, what, what is your, what, what, what is it about your depression?  Is it just depression that you're having problems with?

A       Oh.  The depression and anxiety.

Q       All right.  Do you see a counselor?

A       I did for a little while and take - -

Q       How long did you, did you see a psychiatrist, or a psychologist, or a therapist?

A       Probably two months and the - -

Q       Do you - -

A       - - six times.

Q       - - remember when?

A       No.  I don't.

Q       Is any of your impairments the result of a work related injury?

A       My back was work related.

Q       Or did you draw Workers' Comp.?

A       No, sir.

Q       Did you make an application for Workers' Comp.?

A       No, sir.

Q       Did you make an application for Workers' Comp.?

A       No.

Q       So even though it was work related you didn't file any comp. claim?

A       I didn't pay into Workmen's' Comp. at all on my own.

Q       All right.  And that's when your back was injured in your own work?

A       Yeah.

Q       Are you receiving any help from the State of West Virginia?

A       Not that I know of.

Q       No Food Stamps, no medical coverage, or nothing?

A       May - - Food Stamps, I think.  I won't swear to that, but I think.

Q       Well, you don't know whether you get Food Stamps every month or not?

A       No.  I don't.  My wife takes care of all that stuff.  I don't know and honestly I, I don't know.

Q       Do you have a medical card, do you get medical attention?  How do you pay for your surgeries and everything?

A       My, my wife has insurance through her work.

Q       All right.  All right.  Now tell me about your hearing loss.  Can you hear me okay today?

A       Yeah.  I can hear you out of my left ear.

Q       Well which ear do you have problems with?

A       The right.

Q       What, what has to happen before you can't hear me at all?  I mean do noise, noise block it out or - -

A       Yeah.

Q       - - what?

A        It, it just got a ringing and humming.  I don't hear real low voices.
Q        Okay.  Anything else?  What's the bursitis?  What, what shoulder are you having trouble with?
A        The left.
Q        Is it all right now?
A        Yeah.  For awhile it has been.
Q        You haven't had any surgeries on your shoulder or anything?
A        No, sir.
Q        Anything else causing you problems?
A        Not that I can think of.
Q        Do you take pain medication today?
A        Yes, sir.

                           *                 *                 *

Q        Okay.  What pain medication do you take?
A        I got pain patches, hydrocodone - - is that what that - - do you remember what that was?
ATTY        I've, I've got it here and the Judge has your list.
BY ADMINISTRATIVE LAW JUDGE:
Q        When are you having the radio frequency oblation procedure?
A        I have to see a psychiatrist the last of the part of this week and then, then they'll schedule me for the, for the rest of it.
ATTY        Your Honor?
BY ADMINISTRATIVE LAW JUDGE:
Q        When are you supposed to have the morphine - - oh, go ahead.
ATTY        I, I apologize for - - I think you've already had the radio frequency oblation.
CLMT        Yeah.  I already had that done, the - -
ATTY        Yeah.
BY ADMINISTRATIVE LAW JUDGE:
Q        When was that, Mr. Miller, From your recollection there's no tricks - -
A        I don't - -
Q        - - tramps.
A        The first part of this year, I think.
Q        All right.  How many have you had?
A        I think we done that twice.
Q        Did you get relief?
A        For a little while.
Q        What about the morphine pump when are you scheduled for that?
A        I - - oh.  I'm not, not exactly sure, you know, I see - - supposed to see a psychiatrist before they do anything.
Q        Okay.  On the pump?
A        Yeah.  On the pump or the spinal cord - -
Q        So, - -
A        - - stimulator.

Q  - - so do I understand you to say that you had surgery in '03 and it didn't help?

A  I put - - felt pretty good about for about five to six months.

Q  Did you re-injure it?

A  I don't  - - they done thing that maybe it was the nerves is pinched or something in there, I don't know, scar tissue or something.

Q  Do you have any other surgeries planned?

A  No.  Not yet.

Q  Has a doctor recommended surgery - -

A  No.

Q  - - again?

A  No, sir.

Q  Do you still see the same surgeon?

A  Yeah.

Q  And he says that, that, that - - does he tell you there's any problems or does, does he give you an opinion as to what's causing your problem?

A  Well he just - - mostly scar tissue.

Q  How would you describe the pain to me, what words would you use?

A  I have sharp pains, twisting pains; it's felt like you get hands wrapped around your spine and twisting like you was wringing out a rag.

Q  How long does it last when it happens - -

A  Well it - -

Q  - - or is it constant?

A  Shooting pain lasts, oh, maybe five or 10 minutes, the rest of it's constant, never stops.

Q  Where do you have this pain mostly?

A  In the middle of my back and my left hip, lower back.

Q  What do you do to make it worse or aggravate it?

A  It could be setting, standing, walking, it - - laying down, laying down aggravates it sometimes at night that you can't stand it.

Q  And is Dr. Biendo and - - how do you pronounce that other doctor's name?

ATTY  Labatia, Your Honor.

BY ADMINISTRATIVE LAW JUDGE:

Q  Are they still your treating doctors?

A  Yes, sir.

Q  How often do you see them?

A  Oh.  Once or twice [sic] a month.

Q  And they prescribe your medication?

A  Yes, sir.

Q  Who do you see for your nerves?

A  Dr. Conan Buckanon (Phonetic).

Q  And how often do you see him?

A  Every three months.

Q  What are you taking for your nerves?

A  Paxil.

Q    Now do all these medications have any side effects for you?
A    Yeah.  They do.
Q    Tell me what they are.
A    Oh.  You get tired and sleepy.
Q    Anything else?
A    Oh.  You get numb headed.
Q    How far can you walk on level ground?
A    Oh.  A hundred yards.
Q    How long can you stand?
A    Oh.  20 minutes.
Q    Are you able to bend over?
A    A little.  Not, not constant.
Q    Can you stoop?
A    Not very well.  It's hard for me to get up.
Q    How about squat straight down?
A    I can go down, but then I can't get back up unless I get a hold of something.

                    *                    *                    *

Q    Do you have any limits in your ability to hold your fist and make a fist in your hand?
A    No.  I could make a fist.
Q    Let me see you make a fist with both your hands.  Do you have any problem doing that?
A    No.
Q    Do you have feeling in both your hands?
A    Yes, sir.
Q    Can you use your hands to hold a fork and spoon, button your shirt, zip your pants, things like that?
A    Yeah.
Q    How about lifting?  What's the heaviest you could lift today?
A    I don't know.  I have no idea what.
Q    How about sitting like you are now how long can you sit before you have to change positions?
A    And then I probably change positions already 10 times setting here.
Q    All right.  So how long are you able to sit?
A    Oh, Maybe 15 minutes is comfortable.
Q    All right.  Does your nerves affect your memory?
A    I don't think so.
Q    Do you watch TV?
A    Yes.
Q    Do you have any problems understanding or following the program or the shows you watch?
A    Some of them.
Q    Is that because you can't understand them or - -
A    Just hearing loss.

Q     - - what, what - - .  Oh.  You, you have difficulty hearing sometimes?
A     Yeah.
Q     Do you have to turn the TV volume up?
A     When there's nobody there.
Q     How about crowds of people do they make you uncomfortable?
A     Yes, sir.
Q     How many?
A     It don't take about five or six.
Q     Do you have any problem dealing with a stranger?
A     Alone it's not bad, but if there's a lot of them I don't like it.
Q     And when did you start the treatment for your nerves, do you remember?
A     I'm not sure.
Q     But you go every two months?
A     Yeah.

                        *                *                *

Q     Your sleep.  How many hours a night do you average sleeping?
A     Oh.  About two or three hours.
Q     What happens to you during the night?
A     My back hurts and I can't keep comfortable and have to get up and - -
Q     Now with respect to your ability to take care of your personal needs; I'm talking about either trimming your beard, showering, or taking a bath, dressing yourself, performing your personal hygiene matters, you know, the toileting - -
A     Yeah.
Q     - - and things like that.  Can you do that on your own?
A     Pretty well.
Q     Do you do any cooking at all around the house?
A     Maybe once a week.
Q     Who takes care of the child, the young child?
A     My son.
Q     Well isn't he in school?
A     Yes, sir.  Both are in school.
Q     The five year olds in school as well?
A     Kindergarten.  Yes, sir.
Q     Do you have any duties with respect to taking the child to school?
A     No.

                        *                *                *

Q     Okay.  On a typical day what time do you find yourself out of bed in the morning?
A     Oh.  Some mornings I'm up at two, three o'clock and stay up and get in the recliner, or chair, or the couch, or something.
Q     And what will you do?
A     Television or I cat-nap a little bit.
Q     What time do your children get off to school?
A     Seven o'clock.

| | |
|---|---|
| Q | Do you have to help them get ready for school? |
| A | On occasion I help the little one. |

         \*            \*            \*

| | |
|---|---|
| Q | What will you do in the afternoons to spend your time? |
| A | Nothing. |
| Q | You don't have any hobbies or activities? |
| A | Not that I can do. Maybe read a book once in awhile, but - - or an article. |
| Q | Do you ever use a computer? |
| A | No. |
| Q | Not connected to the internet or anything? |
| A | No. |

         \*            \*            \*

| | |
|---|---|
| Q | Do you help them with their homework or anything? |
| A | Oh. The little girl reads, does her reading with me. |
| Q | What are some of the things you've given up? What don't you do now you used to? |
| A | Basically everything. |
| Q | Well I need to know what you used to do. I mean everything - - |
| A | Well I can - - |
| Q | - - could be pretty broad. Did you hunt, fish? |
| A | I hunted, and fished, and trapped, and helped my neighbors, and I don't do any of that anymore. |
| Q | How, how long has it been since you've had a hunting and fishing license? |
| A | I've still got a hunting and fishing license, but I haven't been hunting and fishing for two years. |
| Q | So you renew it every year? |
| A | Yes, sir. Just in the hopes. |
| Q | Well do you, do you do any hunting on your own land or anything like that? |
| A | No, sir. Not in the last three years. |
| Q | But you've never missed a year getting a license? |
| A | I always get my license. There was one thing you always hoped for, at least, maybe you get to go. |
| Q | But you've never gone? |
| A | No, sir. |
| Q | You don't even go fishing? |
| A | No. |
| Q | What else have you given up? |
| A | I haven't - - wood, wood shop I don't do that anymore. |
| Q | So you don't do any carpentry work, or woodworking, or anything like that? |
| A | No, sir. |
| Q | What did you used to make in your woodshop? |
| A | Muzzle loading rifles. |
| Q | And you don't do that anymore? |
| A | No. |

Q       You don't go to any shows or try to sell anything like that now?
A       No.  Never tried to sell any before.
                        *                *                *
Q       The home in which you live is it one floor or two-story?
A       One floor.
Q       You use steps?
A       Two steps.
Q       Do you help around the house with housework?
A       I may wash dishes once or twice a week.
Q       You don't do any trash?
A       No.
Q       Who does the trash?
A       My son.
Q       Who does the mowing?
A       My son.
Q       Who does the laundry?
A       My son and my wife.
Q       Who does the shopping?
A       My wife.
Q       You don't go grocery shopping?
A       No, sir.
Q       When was the last time you went shopping?
A       It been a long time, over probably two or three years.
Q       What is it about your condition that keeps you from going out, going shopping?
A       I just never did like to do it to start with.
Q       How do you get to your medical appointments?
A       My wife.
                        *                *                *
EXAMINATION OF CLAIMANT BY ATTORNEY:
Q       Mr. Miller, you did talk with the Judge some about side effects of your medications and, you know, at one point you said they made you numb headed.  Can you tell me what that means?
A       Like dizzy, like you been drunk and you can't read, and you can't put stuff together and just - -
Q       For instance when you would be watching TV does that affect in any way the - -
A       Watching it you're not really paying any attention to it, it's just something a going on.
Q       Would that affect your ability to do work tasks?
A       I would think.
Q       Now, I think, there was some indication in the record that you - - your medications were making you sleepy.
A       Yes, sir.
Q       How often does that occur?
A       Everyday.

34

Q How often do you have this, this numb headed feeling that you were describing?

A After I take the pain pill in about an hour and I take them twice a day, so - -

Q Okay.

A - - maybe twice a day.

Q Now you also - - you actually wear a, a Duragesic pain patch.

A Yes, sir.

Q Does, does that cause you any side effects?

A Yeah.

Q Well - -

A It makes you tired and hot and - -

Q Okay. Now do you have that on all the time?

A Yeah.

Q Mr. Miller, do you ever lay down during the day?

A At times.

Q Tell me why do you do that?

A I just get tired just standing, and setting, and you just want to lay down for a little bit.

Q Does that help with your back pain at all?

A Not very often. It just - - you're just so tired you wanted to lay down.

Q What would happen if you were in a, a work situation where you were not - - you didn't have the opportunity to lay down?

A I'd have to quit.

Q Quit what?

A Quit working.

Q Okay. What, what would happen to your condition if you didn't do that, I mean, how would you feel?

A Just, just be real tired all the time and - -

Q Okay. Now if you were at a - - if you had a job situation that was different than what you had done in the past, it was a sit down job where you didn't - - or maybe you only to lift five pounds and you could stand up whenever you wanted to, would you be able to do that type of job?

A Probably not.

Q Why do you think that?

A I've never done anything like that before anyway.

Q What - - would your medical condition allow you to do that?

A I doubt it.

Q Okay. Would - - if we were talking about full-time work, would you be - - have any problems with attendance?

A Probably.

Q Would you be reliable?

A Probably not.

Q Do you think you'd be able to be there everyday on time when you were supposed to be there?

A No.

Q     What would keep you from doing that?

A     Not be able to get up and - - a lot of mornings where you don't sleep all night.

Q     Okay. Now, Mr. Miller, it looks like you've gone through several different types of treatment. Why have you done all these different treatments?

A     I want to get rid of the pain.

Q     And, - -

A     I'd like to go back to work someday.

Q     Okay. And you're still in - - even now you're pursuing this spinal cord stimulator?

A     Yes, sir.

*              *              *

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q     All right. Would you classify the exertional and skill level of the claimant's past work in the 15 years, what it is?

A     Yes, Your Honor. The claimant indicate, indicated that he was self-employed for one period during the past 15 years cutting timber that's at the heavy, the very heavy level, it's a semi-skilled job, Your Honor. He also worked in a saw mill as a laborer and also a cutter and various other activities that's a semi-skilled job, once again, heavy to a very heavy level. And he also performed some other construction, laboring jobs that were heavy, unskilled. He also was a rod man for a survey crew and that job was performed at the heavy level, unskilled.

Q     Well it appears that the claimant's profile in this case between the ages of 41 and 45 defined in the regulations as a younger individual, he has a high school education, and, of course, the past relevant work that you've identified. I want you to consider the hypothetical of the State agency in Exhibit 19F which indicated that the claimant could do medium exertional level of work activity; stand and walk six hours of those with normal breaks; occasionally climb; avoid concentrated exposure to temperature extremes of cold as well as the concentrated exposure to hazards of moving plant machinery and unprotected heights. I want you to also consider that the claimant is - - has a hearing loss so, therefore, noise or working in a noisy environment would be difficult for the claimant to do to (INAUDIBLE). Now if we take that hypothetical into consideration and looking at his past work you classified all of his work as heavy.

A     Yes, Your Honor.

Q     So he would not be able to do his past work, is that correct?

A     That's correct.

Q     At the medium, at the medium - - the, the State agency reconsidered and presented a hypothetical that's of record in 11F that would have been prior to or at about the time of his back surgery with a light exertional level of work activity; lift 20 pounds occasionally, 10 pounds frequently; again, stand and walk six hours in an eight hour day; sit six hours in a eight hour day; with all the posturals at occasion. Now we have to consider furthermore his hearing loss which would preclude working in a noisy environment, there's no indication of deafness, no indication of hearing-aid requirement, so it would just be avoiding the workplace in a noisy environment. Of course, at the light exertional level of work activity as described his past work would also be precluded, is that correct?

A     Yes, Your Honor.

Q     Now to the light hypothetical that I previously gave you I want you to consider that such an individual would be limited to simple, routine type of work activity; that such an individual would be limited to occasional contact with supervisors, co-workers, and the general public; and I want you to consider the, again, the limitation to no fast-paced production type quota work activity as a result of distractions due to pain. At the light level with those mental non-exertional limitations would there be work in the national and regional economies such as an individual could perform?

A     Yes. May I have a moment or two? I'm ready, Your Honor.

Q     All right, sir. You may proceed.

A     Your Honor, considering the hypothetical you've just given me in my, my testimony that jobs would exist in the national economy also in that of the State of West Virginia at the light level, unskilled the position of cafeteria worker, 400,000 jobs minimally in the U.S., at least, 1,400 in the State of West Virginia. Also at the light level the position of light housekeeper at the light level, one and a half million jobs in the national economy, at least, 12,000 jobs in the State of West Virginia. Also at the light level the position of a guard, gate guard, 100,000 minimally in the U.S., at least, 700 in the State of West Virginia and all consistent with the <u>DOT</u>.

Q     All right, sir. Now the neurosurgeon Counsel argues at Exhibit 27F that the MRI of the lumbar spine reveals no significant neural encroachment or stenosis and no evidence of recurrent disk herniations, no surgical intervention is recommended, but cannot return to any type of gainful employment and support disability. I want you to consider that if I find the claimant's testimony credible and consistent with the medical evidence of record and supported by the medical evidence of record so as to eliminate even a sedentary work activity, by that I mean not even lift 10 pounds occasionally or five pounds frequently and the ability to maintain attention and concentration because of pain rises to the level of marked so as to preclude even simple, unskilled type job, if that would be the case and consistent with the statement of the neurosurgeon, would all jobs be eliminated?

A     Yes, Your Honor.

*               *               *

EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q     Mr. Panza, in the, the type of jobs that we discussed here today appears to be unskilled type work, simple routine type work. How much time, if you know, can a person be off-task during the day and still remain employed?

A     (No audible response.)

Q     And, I guess, let me clarify. What I'm asking is outside of the lunch period and normal breaks.

A     Are you talking about percentages, or are you talking about time, or what are - -

Q     Either one whichever you may be more familiar with.

A     Well if an individual is unable to perform his duties say an hour at a time per day that would eliminate all jobs.

Q     Okay. So if a person had to lay down for an hour outside of the, the normal lunch period and, and morning and afternoon breaks for an hour that would preclude work?

A     Yes.

Q    And, and also if a person were just generally off-task due to side effects of medication for a, a total of an hour that would eliminate jobs?

A    Yes.

Q    Now let me ask one final question.  If, if in the file there were - - there was an opinion from a State agency Consultative Examination from Dr. Bennet Ordrick (Phonetic) at 17F and Dr. Ordrick's opinion was that Mister, Mr. Miller would have a difficult time even doing sedentary work and, and this opinion was, obviously, inconsistent with the State agency opinions of medium and light, so, effectively, if - - let's just say that you had someone that was at most limited to sedentary jobs, no more than sedentary jobs, would they be able to do the, the cafeteria worker, housekeeper, and gate guard jobs that you mentioned earlier?

A    No, sir.

Q    Okay.  Oh.  One final question, Mr. Panza.  How many days  - - what is the standard number of days per month in this type of work that a person can miss and remain employed?

A    Well usually if an individual misses more than an average of one or more quarter days per month over the first six months of employment and if that is not remediated or based upon good credible evidence to their actions then they are eliminated from employment, they are terminated in other words.

*          *          *

E.    Lifestyle Evidence

The following evidence concerning Claimant's lifestyle was obtained at the hearing and

through medical records.  The information is included in the report to demonstrate how

Claimant's alleged impairments affect his daily life:

• has a drivers license and is able to drive short periods (Tr. 55, 200)
• is able to walk 100 yards, stand for 20 minutes (Tr. 68)
• has trouble bending, stooping, and squatting (Tr. 68-29)
• is able to sit for 15 minutes (Tr. 69)
• has trouble watching television due to hearing loss (Tr. 70)
• has trouble sleeping (Tr. 71-72, 201)
• is able to take care of his personal needs (Tr. 72, 201)
• is able to prepare meals (Tr. 72, 202)
• sometimes helps his son prepare for school (Tr. 73)
• is no longer able to hunt and fish or do carpentry work (Tr. 75-76, 204)
• washes dishes 1-2 times per week (Tr. 77)
• does not take out the trash or cut the grass (Tr. 77)
• assists in cleaning and completing minor household repairs (Tr. 202)
• goes outside daily (Tr. 203)
• inconsistencies regarding ability to grocery shop (Tr. 77, 203)
• is able to pay bills, count change, handle a savings account, and use a checkbook (Tr.

203)
- visits friends on a regular basis (Tr. 204)
- has some trouble following directions (Tr. 205)

### III.  The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant argues that the ALJ erred by failing to properly consider the medical opinions

of record.  Further, Claimant argues that the ALJ erred by failing to properly consider Claimant's

credibility.  Last, Claimant argues that the ALJ erred by failing to include all of the limitations

confirmed by the record in the RFC finding and in hypothetical questions to the VE.

Commissioner contends that the ALJ correctly evaluated the medical source opinions in

accordance with the Regulations, properly evaluated Claimant's subjective complaints, and

properly relied on vocational evidence to evaluate Claimant's claim.

B.    <u>Discussion</u>

1.    Whether the ALJ Properly Considered the Medical Opinions of Record.

Claimant argues that the ALJ summarily rejected every medical opinion favorable to

Claimant's claim in the record.  Specifically, Claimant argues that the ALJ failed to mention Dr.

Douglas's opinion that Claimant would not be able to "return to any type of gainful employment

and at this juncture I would wholeheartedly support his disability;"[6] improperly summarily

rejected Dr. Labatia's opinion by stating it was not consistent with his own objective clinical

findings or with the weight of the objective evidence as a whole; and improperly summarily

rejected Dr. Orvik's opinion by giving too little weight stating "such a conclusion is overly

---

[6] Pl. Br. P. 7 (citing Tr. 513).

reliant upon the claimant's subjective reports."[7]  Commissioner contends that the ALJ correctly evaluated the medical source opinions in accordance with the regulations.  Specifically, Commissioner argues that the ALJ did not accept Dr. Douglas's opinion because the opinion of disability is reserved to the Commissioner, Dr. Labatia's opinion because his opinion was not supported by his own clinical findings or the objective evidence as a whole, and Dr. Orvik's opinion because it was based on Claimant's subjective complaints and not supported by objective medical findings.

All medical opinions are to be considered in determining the disability status of a claimant.  20 C.F.R. §§ 404.1527(b), 416.927(b).  Nonetheless, opinions on ultimate issues, such as RFC and disability status under the regulations, are reserved exclusively to the ALJ.  20 C.F.R. §§ 404.1527(e)(1)-(3), 416.927(e)(1).  Statements by medical sources to the effect that a claimant is "disabled" are not dispositive, but an ALJ must consider all medical findings and evidence that support such statements.  Id.  The opinion of claimant's treating physician is entitled to great weight and may only be disregarded if there is persuasive contradictory evidence.  Evans v. Heckler, 734 F.2d 1012, 1015 (4th Cir. 1984).  Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources, when the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and 2) not inconsistent with other substantial evidence in the case record.  20 C.F.R. §416.927(d)(2). See Craig, 76 F.3d at 590 (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and

---

[7] Pl. Br. P. 10 (citing Tr. 27).

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record).  While the credibility of the opinions of the treating physician is entitled to great weight, it may be disregarded if there is persuasive contradictory evidence.  Evans, 734 F.2d at 1015.

To decide whether the impairment is adequately supported by medical evidence, the Social Security Act requires that impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Heckler v. Campbell, 461 U.S. at 461; 20 C.F.R. §§ 404.1508; Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).  Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist.  20 C.F.R. § 404.1527 (2005).  Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant.  Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001).  However, "although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight."  Id. (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).

a) Dr. Douglas

On January 24, 2006, after a return office visit, Dr. Douglas wrote that Claimant "has been aggressively trying to get his pain alleviated and return to the work force; however, I do not

think he will return to any type of gainful employment and at this given juncture I would wholeheartedly support his disability." (Tr. 513). Claimant argues the ALJ violated the treating physician rule because the ALJ failed to mention Dr. Douglas's opinion despite being aware of it.

Claimant relies on <u>Hines v. Barnhart</u>, 453 F.3d 559 (4th Cir. 2006) in maintaining that the ALJ improperly followed the treating physician rule. Though Claimant's characterization of the treating physician's rule is correct, Claimant fails to realize that opinions on ultimate issues, such as RFC and disability status under the regulations, are reserved exclusively to the ALJ. 20 C.F.R. §§ 404.1527(e)(1)-(3), 416.927(e)(1). Moreover, the ALJ is not obligated to "give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (e)(1) and (e)(2)." § 404.1527(e)(3).

Dr. Douglas opined that Claimant would not return to the workforce anytime soon and he would support Claimant's disabled status. This opinion was on Claimant's status as disabled; such an opinion is reserved to the Commissioner. Therefore, the ALJ had no obligation to consider Dr. Douglas's opinion as to Claimant's disability status. The ALJ did have an obligation to "review all of the medical findings and other evidence that support a medical source's statement that you are disabled." § 404.1527(e)(1). The ALJ did consider Dr. Douglas's January 24, 2006 report citing that "recent MRI studies obtained in January 2006 reveal no evidence of recurrent disc herniation or significant neural encroachment or stenosis, and total body scan shows no evidence of significant abnormal increased activity (Exhibit 27F)." (Tr. 23).

The ALJ did not improperly reject Dr. Douglas's opinion.

b) Dr. Labatia

On September 19, 2006, Dr. Labatia completed an RFC assessment concluding that Claimant could lift no more than 10 pounds, stand/walk 1-2 hours in an 8-hour workday, and sit for 2-4 hours in an 8-hour workday. (Tr. 552-54). On October 2, 2006, Dr. Labatia wrote a letter to Claimant's counsel explaining Claimant's condition, treatment to date, and lack of success in relieving Claimant's opinions. These two records, according to Claimant, equate an opinion by Dr. Labatia of Claimant's inability to work. Claimant argues that the ALJ improperly summarily rejected this opinion and gave it zero weight by finding that the opinion was not consistent with his own objective clinical findings or with the weight of the objective evidence as a whole. Claimant relies on Worzalla v. Barnhart, 311 F.Supp.2d 782 (E.D. Wis. 2004) in arguing that the ALJ's finding is not supported by any other medical opinion or testimony; rather, the ALJ "simply offered his own unqualified medical analysis and opinion that Dr. Labatia's opinion was not consistent with various objective and clinical findings in the record."[8] Additionally, Claimant relies on Hines in arguing that the ALJ improperly "required objective proof of the pain itself before he would give Dr. Labatia's opinion any weight."[9]

Claimant's reliance on both cases is misplaced. First, Claimant relies on Worzalla to argue that the ALJ offered his own unqualified medical analysis and opinion that Dr. Labatia's opinion was not consistent with the other objective medical evidence of record. The District Court in Worzalla held that the ALJ erred by impermissibly playing doctor and evaluating the medical evidence in the record. Worzalla, 311 F.Supp.2d at 782. In coming to this conclusion,

[8] Pl. Br. P. 8.

[9] Pl. Br. P. 9.

43

the Court found that the ALJ "cited no medical evidence in support of his finding, deciding for himself 'the most accurate diagnosis'" and "failed to properly evaluate the medical evidence." Id. at 795-96. Claimant relies on the Court's statement that "courts have regularly warned ALJs not to attempt to interpret test results or other raw medical data."[10] However, Claimant's reliance on this statement is misplaced. The Court cites this rule of law only after finding that the ALJ improperly rejected a treating physician's report for failing to provide the scores for the tests she administered. Id. at 796. Criticizing the ALJ, the Court asks what the ALJ would have done with the scores noting that "provision of the figures is worth little absent the ability to properly evaluate them." Id. It is this discussion that led to the Court's warning to ALJs of not to interpret test results.

The case at bar is, therefore, distinguishable from Worzalla in two respects. Not only did the ALJ cite to objective medical evidence in his decision to afford little weight to Dr. Labatia's opinion, but also did not attempt to interpret any of this medical evidence. In deciding to afford little weight, the ALJ makes numerous references to objective medical evidence. The ALJ notes that "Dr. Labatia's assessment, if supported, would be indicative of 'total disability;' yet, postoperative studies, including MRI and CT myelogram, have revealed no evidence of recurrent disc herniation or nerve root compression, and aside from a small amount of scar tissue at the surgical site, there is no evidence of obvious surgical lesions (Exhibit 20F)." (Tr. 27). Additionally, the ALJ states, "[w]hile nerve conduction studies have evidenced peripheral neuropathy, lumbar radiculopathy, and peroneal nerve palsy, the claimant has denied having any significant weakness in his lower extremities and he retains the ability to ambulate effectively

---

[10] Pl. Br. P. 8 (citing Warzalla, 311 F.Supp.2d at 796).

and independently." (Tr. 27). Last, the ALJ notes that neurological exams have remained consistently intact; Claimant has repeatedly denied any significant bowel/bladder dysfunction; there's no indication for further surgery; no other physician restricted work-related activities; and Claimant admitted improvement in some of his symptoms. (Tr. 27).

All medical opinions are to be considered in determining the disability status of a claimant; however, controlling weight may be given only when the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §§416.927(b) &(d)(2). The ALJ properly considered Dr. Labatia's opinion and afforded it little weight after citing contradictory objective medical evidence.

Second, Claimant relies on <u>Hines</u> to support his assertion that the ALJ impermissibly required objective proof of the pain itself before he would give Dr. Labatia's opinion any weight. Again, Claimant's reliance is misplaced. Claimant is correct in citing that the Court in <u>Hines</u>, after finding medically determinable impairments that could reasonably be expected to produce the alleged symptoms, found that the claimant was entitled to rely exclusively on subjective evidence to prove his pain was so continuous and/or so severe that it prevented him from working a full 8-hour workday. <u>Hines</u>, 453 F.3d at 565. However, Claimant fails to mention that, while the Court permitted Mr. Hines to rely exclusively on subjective evidence, the Court also noted

> While objective evidence is not mandatory at the second step of the test, [t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its

> severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

Id. Therefore, claimants are not always entitled to rely exclusively on subjective evidence because ALJs are permitted to consider objective medical evidence and discredit subjective complaints of pain when they are not supported by the objective medical evidence.

Again, the case at bar is distinguishable from Hines. First, and perhaps most importantly, the claimant in Hines suffered from Sickle Cell Disease, a disease which leaves its victims in a disadvantaged position due to its unique nature of rarely producing objective medical evidence. Id. at 561. Claimant alleges that the ALJ require he "show he had a disc herniation, nerve root compression, muscle weakness, bowel/bladder dysfunction and a subsequent surgery." These are hardly the equivalent to Sickle Cell Disease. Second, and as explained fully supra, the ALJ permissibly evaluated the objective medical evidence of record in deciding to afford little weight to Dr. Labatia's opinion. Claimant contends that the ALJ required objective proof of the pain itself before he would give Dr. Labatia's opinion any weight; however, that statement is inaccurate. The ALJ didn't require objective proof; the ALJ simply evaluated the existing objective medical evidence and found that it was not consistent with Dr. Labatia's opinion.

Therefore, the ALJ did not err in considering Dr. Labatia's opinion.

c) Dr. Orvik

On May 3, 2005, Dr. Orvik completed a disability determination exam for the West Virginia Disability Determination Service. (Tr. 418-26). In his report, Dr. Orvik stated that Claimant appeared to have a significant problem with his left leg, did not appear to be able to do anything physical, and had a lifting limit of 15 pounds. (Tr. 424). Dr. Orvik further stated that

"if this is true he certainly would not be able to do a physical job." (Tr. 424). Claimant argues that the ALJ improperly summarily rejected Dr. Orvik's opinion, and in doing so, the ALJ failed to recognize the overwhelming consistency of the opinions of Dr. Orvik, Dr. Douglas, and Dr. Labatia.

In rejecting Dr. Orvik's opinion, the ALJ stated that Dr. Orvik relied too much on Claimant's subjective reports in his conclusion and that, aside from a positive straight leg raise and decreased lumbar spine flexion and extension, Dr. Orvik's report showed normal range of motion in all other areas. As Commissioner contends, the ALJ was permitted to afford little weight to Dr. Orvik's opinion if it was inconsistent with other objective medical evidence. 20 C.F.R. §416.927(d). The ALJ properly followed the regulations and cited inconsistent objective medical evidence in deciding to afford little weight to Dr. Orvik's opinion. First, the ALJ notes that "Dr. Orvik points out that the only abnormalities on exam was positive straight leg raise (which is also subjective), and decreased lumbar spine flexion and extension to 70 degrees (not marked). Otherwise, Dr. Orvik's report shows normal range of motion in all other areas including the upper extremities, neck, knees, hips, and ankles." (Tr. 27). Further, the ALJ states that "[a]ccording to Dr. Orvik's report, there were also no areas of joint inflammation, tenderness, swelling, or deformity, and while his stance appeared somewhat apprehensive and fearful of falling, he was not currently using a cane to ambulate." (Tr. 27). Lastly, the ALJ states that "Dr. Orvik additionally noted that the claimant was able to tandem walk, walk on his heels/toes, and squat, all 'fairly well,' and with regard to his manipulative abilities, he demonstrated the ability to write well and pick up small objects well." (Tr. 27).

Claimant argues that in rejecting Dr. Orvik's opinion, the ALJ failed to recognize its

consistency with the opinions of Dr. Labatia and Dr. Douglas. However, the consistency of the three is irrelevant because each opinion relates to the disabled status of Claimant. As explained supra, the ALJ is charged with determining the claimant's disabled status. 20 C.F.R. §404.1527(e)(1). Therefore, the ALJ's failure to recognize the consistency of the three opinions is irrelevant.

The ALJ did not improperly summarily reject Dr. Orvik's opinion.

2.      Whether the ALJ Properly Considered Claimant's Credibility.

Claimant argues that the ALJ erred by failing to properly consider Claimant's credibility. Specifically, Claimant, relying on <u>Hines v. Barnhart</u>, 453 F.3d 559, argues that the ALJ erred at step two of the credibility analysis by requiring that Claimant submit objective evidence of the severity of the pain itself rather than permitting Claimant to rely exclusively on subjective evidence. Commissioner contends that the ALJ properly evaluated Claimant's subjective complaints. Specifically, Commissioner argues that under the regulations, an ALJ may not find a claimant disabled based on subjective symptoms alone; rather, there must be medical signs and laboratory findings which show that a claimant has a medical impairment that could reasonably be expected to produce the pain or other symptoms alleged.

The Fourth Circuit stated the standard for evaluating a claimant's subjective complaints of pain in <u>Craig v. Chater</u>, 76 F.3d 585 (4th Cir. 1996). Under <u>Craig</u>, when a claimant alleges disability from subjective symptoms, he must first show the existence of a medically determinable impairment that could cause the symptoms alleged. <u>Id</u>. at 594. The ALJ must next "expressly consider" whether a claimant has such an impairment. <u>Id</u>. at 596. If the claimant makes this showing, the ALJ must consider all evidence, including the claimant's statements

about his symptoms, in determining whether the claimant is disabled. Id. at 595. While the ALJ

must consider the claimant's statements, he need not credit them to the extent they are

inconsistent with the objective medical evidence or to the extent the underlying objective

medical impairment could not reasonably be expected to cause the symptoms alleged. Id.


Claimant concedes that the ALJ found, consistent with Craig, that Claimant suffered

from a medically determinable impairment that could reasonably cause the symptoms alleged.

(Pl. Br. at 11; Tr. 26). However, Claimant erroneously relies on Hines in arguing that the ALJ

improperly required objective evidence of the severity of the pain itself. Though the Court in

Hines found that the claimant was entitled to rely exclusively on subjective evidence, the Court

noted that:

> While objective evidence is not mandatory at the second step of the test, [t]his is
> not to say, however, that objective medical evidence and other objective evidence
> are not crucial to evaluating the intensity and persistence of a claimant's pain and
> the extent to which it impairs her ability to work. They most certainly are.
> Although a claimant's allegations about her pain may not be discredited solely
> because they are not substantiated by objective evidence of the pain itself or its
> severity, *they need not be accepted to the extent they are inconsistent with the
> available evidence, including objective evidence of the underlying impairment*,
> and the extent to which that impairment can reasonably be expected to cause the
> pain the claimant alleges she suffers.

453 F.3d, at 565 (emphasis added) (citing Craig v. Chater, 76 F.3d 585, 595 (4th Cir. 1996).

Therefore, claimants are not automatically entitled to rely exclusively on subjective evidence to

show that they are unable to perform work eight hours per day, five days per week.

Additionally, the claimant in Hines suffered from sickle cell anemia. As the Court noted, sickle

cell anemia "is particularly insidious because it rarely produces the objective medical evidence

that clinicians desire. . . there is no way to demonstrate objectively that a SCD patient has pain . .

. ." Id. at 561. "Given the unique characteristics of the disease at issue in this case," the Court

held that the ALJ erred. Unlike the claimant in Hines, Claimant is not suffering from a disease

that rarely produces objective medical evidence. Therefore, the ALJ is permitted to evaluate the

subjective allegations in accordance with the objective medical evidence.

This Court finds that the ALJ had substantial evidence to discredit Claimant's subjective

statements. As explained in detail supra in part 1, the ALJ need not credit a claimant's

subjective complaints regarding pain "to the extent they are inconsistent with the available

evidence, including objective evidence of the underlying impairment, and the extent to which

that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

Id. at 565. The ALJ engaged in this very practice. As Claimant admits in his brief, the ALJ

found

> The degree of functional limitation described by the claimant is not otherwise
> consistent with or supported by the weight of the *objective* evidence as a whole. . .
> ." (Id.) (emphasis added). ". . . His neurological status has remained essentially
> intact throughout and there is no indication for further surgical intervention." Id.
> at 10. He has not required ". . . crisis intervention or stabilization. . . ." Id. He
> has not had ". . . additional hospitalizations for his back problems, status post
> surgery." Id.[11]

The ALJ examined the objective medical evidence and found Claimant's subjective complaints

to be inconsistent with the objective medical evidence of record. This evaluation was

permissible and done in accordance with Hines.

Claimant further argues that the ALJ also engaged in selective citation in determining the

tasks which Claimant could perform, offered no citation to the record to suggest that Claimant

had not been fully compliant with his treatment, falsely stated that Claimant admitted

---

[11] Pl. Br. P. 11.

improvement in his overall symptoms and the ability to engage in activities, and failed to cite to the portion of the state agency physician's opinion which found Claimant credible. Lastly, Claimant argues that the ALJ's own statements in the decision support Claimant's credibility.

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 664-65 (1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3).

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (7th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) (citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir.

1990)).

This Court finds that the ALJ had substantial evidence to discredit Claimant and that Claimant did not show that the ALJ's credibility determination was patently wrong. In supporting his decision that Claimant's statements concerning the intensity, persistence, and limiting effects of the symptoms are not entirely credible, the ALJ references the record several times as well as Claimant's own testimony. Even though the ALJ does not cite specific pages in the record to support his conclusion that Claimant has not always been fully compliant with treatment, he does reference the record in regard to his conclusion that his condition has improved. (Tr. 26). Further, the ALJ cites multiple records to support his conclusion that Claimant suffers from no more than a moderate degree of impairment. (Tr. 27). Because this Court's review is limited to determining whether the ALJ had substantial evidence to discount Claimant's credibility, the Court finds that the ALJ did not err in failing to properly consider Claimant's credibility.

3.  Whether the ALJ Erred by Failing to Include all Limitations in the Residual Functional Capacity Finding and in the Hypothetical Question to the VE.

Claimant argues that the ALJ failed to include any of the limitations confirmed by Dr. Labatia's opinion and the psychological limitations confirmed by the state agency reviewing physicians in the hypothetical posed to the VE. Additionally, Claimant argues that the ALJ failed to address Claimant's need to lie down at times due to fatigue. This, Claimant argues, violated SSR 96-8p and applicable case law. Commissioner contends that the ALJ did not err in posing his hypothetical questions to the VE. Specifically, Commissioner contends that the ALJ did not include the limitations based on Dr. Labatia's assessment because he determined that Dr. Labatia's opinion was entitled to little weight. Additionally, Commissioner contends that the

52

ALJ addressed Plaintiff's mental impairments. Last, Commissioner contends that the ALJ did not include Claimant's need to lie down because the medical evidence did not support such a finding.

The Fourth Circuit Court of Appeals has held, albeit in unpublished opinion, that while questions posed to the vocational expert must fairly set out all of the Claimant's impairments, the questions need only reflect those impairments supported by the record. Russell v. Barnhart, 58 Fed. Appx. 25, 30; 2003 WL 257494, at 4 (4th Cir. Feb. 7, 2003)[12]. The Court further stated that the hypothetical question may omit non-severe impairments but must include those that the ALJ finds to be severe. Id. Moreover, based on the evaluation of the evidence, "an ALJ is free to accept or reject restrictions included in hypothetical questions suggested by a Claimant's counsel, even though these considerations are more restrictive than those suggested by the ALJ." France v. Apfel, 87 F. Supp. 2d 484, 490 (D. Md. 2000) (citing Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir.1986)).

The ALJ is afforded "great latitude in posing hypothetical questions." Koonce v. Apfel,[13] 166 F.3d 1209; 1999 WL 7864, at 5 (4th Cir. 1999) (citing Martinez, 807 F.2d, at 774). The ALJ need only pose those questions that are based on substantial evidence and accurately reflect the Claimant's limitations. Copeland v. Bowen, 861 F.2d 536, 540-41 (9th Cir. 1988); see also

---

[12] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

[13] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

<u>Hammond v. Apfel</u>,[14] 5 Fed. Appx. 101,105; 2001 WL 87460, at 4 (4th Cir. 2001).

The ALJ did not err in posing the hypothetical question to the VE. First, as to Claimant's argument that the ALJ failed to include any of the limitations confirmed by Dr. Labatia's opinion, the ALJ had no obligation to include the opinion. As explained *supra*, the ALJ properly discredited Dr. Labatia's opinion because it was contradicted by objective medical evidence. The ALJ need only include impairments supported by the record; therefore, the ALJ did not err in failing to include Dr. Labatia's opinion.

Second, as to Claimant's argument that the ALJ failed to include any of the psychological limitations confirmed by the state agency reviewing physicians, the ALJ properly accounted for Claimant's mental impairment. In the functional capacity assessment, the state agency physicians found that Claimant had the capacity to understand, remember, and carry out 1-3 step instructions within low social interaction demand work settings. (Tr. 414-17). During the hearing, the ALJ posed to the VE the following hypothetical:

> At the medium, at the medium - - the, the State agency reconsidered and presented a hypothetical that's of record in 11F that would have been prior to or at about the time of his back surgery with a light exertional level of work activity; lift 20 pounds occasionally, 10 pounds frequently; again, stand and walk six hours in an eight hour day; sit six hours in an eight hour day; with all the posturals at occasion. Now we have to consider furthermore his hearing loss which would preclude working in a noisy environment, there's no indication of deafness, no indication of hearing-aid requirement, so it would just be avoiding the workplace in a noisy environment. Of course, at the light exertional level of work activity as described his past work would also be precluded, is that correct? . . . Now to the light hypothetical that I previously gave you I want you to consider that such an individual would be limited to simple, routine type of work activity; that such an

---

[14] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

individual would be limited to occasional contact with supervisors, co-workers, and the general public; and I want you to consider the, again, the limitation to no fast-paced production type quota work activity as a result of distractions due to pain. At the light level with those mental non-exertional limitations would there be work in the national and regional economies such an individual could perform?

(Tr. 83-84).

Claimant argues that "instead of presenting the vocational expert with the limitations confirmed by the state agency, he simply instructed the VE that Mr. Miller was ' . . . capable of simple, routine work. . . .' (Tr. 25)."[15] However, that the ALJ actually included more than what Claimant cites in his brief. The ALJ's hypothetical included simple, routine work activity that limited contact with others and excluded fast-paced production type quota work. Additionally, Claimant cites no specific provisions of either SSR 96-8p or case law to demonstrate that the ALJ did not properly pose the hypothetical to the VE. The ALJ is afforded great latitude in formulating hypotheticals and need only include those limitations supported by the record. Even if the ALJ did not include Claimant's mental impairments verbatim, the ALJ did include the mental impairment. Therefore, the ALJ did not err by failing to include Claimant's psychological limitations.

Finally, as to Claimant's argument that the ALJ failed to include Claimant's need to lie down due to fatigue, the ALJ had no obligation to include the limitation. Claimant testified that he must lie down due to fatigue and would be unable to perform even a sedentary job. The ALJ properly excluded this testimony from the hypothetical. The ALJ need only include impairments based on substantial evidence and accurately reflected in the record. The ALJ found Claimant's testimony as to the intensity, persistence, and limiting effects of the symptoms not entirely

---

[15] Pl. Br. P. 14.

credible.  Therefore, the ALJ had no obligation to include the need to lie down in the hypothetical.

### IV.  Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **DENIED** because the ALJ properly considered the medical opinions of record, properly considered Claimant's credibility, and included all limitations confirmed by the record in the hypothetical question posed to the VE.

2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.


Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: November 4, 2009

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE