IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

THOMAS O. MILLER,

      Plaintiff,

v.                     CIVIL ACTION NO. 1:08CV223
                            (Judge Keeley)


MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

      Defendant.


## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b)(1)(B), Rule 72(b), Federal Rules of Civil Procedure and Local Court Rule 4.01(d), the Court referred this Social Security action to United States Magistrate Judge James E. Seibert on December 24, 2008 with directions to submit proposed findings of fact and a recommendation for disposition.

On November 4, 2009, Magistrate Judge Seibert filed his Report and Recommendation ("R&R") which, in accordance with 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 6(e), directed the parties to file any written objections with the Clerk of Court within ten (10) days after being served with a copy of the R&R. On November 13, 2009, Travis M. Miller, counsel for the plaintiff, Thomas O. Miller ("Miller"), filed objections to the R&R. After due consideration of those objections and for the reasons that follow, the Court grants

the defendant's motion for summary judgment and denies the plaintiff's motion for summary judgment.

## I.  PROCEDURAL BACKGROUND

Miller filed his first application for benefits on September 30, 2002. The Commissioner denied this application initially on January 10, 2003, and on reconsideration on May 7, 2003.  Miller did not appeal the final decision.

Miller then filed a second application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on February 17, 2005, which alleged disability since June 18, 2002 due to low back and leg pain. The Commissioner initially denied his claim on May 26, 2005, and denied it on reconsideration on October 6, 2005.  After Miller requested a hearing, an Administrative Law Judge ("ALJ") conducted a hearing on September 26, 2006, at which the defendant and a vocational expert ("VE") appeared and testified.

In a decision dated December 28, 2006, the ALJ determined that Miller was not disabled and retained the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b).  On October 28, 2008, the Appeals Council denied the request for review filed by Miller on January 6,

2007. Miller then timely filed this action on December 24, 2008 seeking judicial review of the Commissioner's final decision.

## II.  <u>PLAINTIFF'S BACKGROUND</u>

As of June 18, 2002, the onset date of Miller's alleged disability, he was forty-one (41) years old. On December 28, 2006, the date of the ALJ's decision, Miller was  forty-five (45) years old and, pursuant to 20 C.F.R. §§ 404.1563(c), 416.963(c) (2009), is considered a "younger person" under the age of 50 whose age generally will not seriously affect the ability to adjust to other work.

Miller has a high school education and is able to communicate in English.  His past work experience includes  self-employment as a timber cutter, sawmill cutter, and construction surveyor.

## III.  <u>ADMINISTRATIVE FINDINGS</u>

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520, the ALJ made the following findings:

1.   Miller met the insured status requirements of the Social Security Act through December 31, 2007;

2.   Miller has not engaged in substantial gainful activity since June 18, 2002, the alleged onset of disability;

3.    Miller has the following severe impairments based on the requirements in Regulation 20 CFR § 404.1520(c): degenerative lumbar disc disease with lumbar radiculopathy, mild spinal stenosis, facet arthropathy, and myofascial pain, obesity (albeit mild), hearing loss, and major depressive disorder;

4.    Miller's impairments, individually or in combination, do not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926);

5.    At all relevant times, Miller retained the residual functional capacity to perform limited to light exertional activity that involves only occasional lifting and/or carrying of a maximum of no more than twenty pounds or frequent lifting and/or carrying of a maximum of ten pounds. He is capable of standing or walking about six hours out of eight, and sitting for about six hours out of eight. His postural activity should include only occasional climbing, balancing, stooping, kneeling, crouching, and crawling. He should not be exposed to noisy work environments and due to distractions due to pain, is limited to, but capable of, simple routine work requiring only occasional contact with supervisors, co-workers or the general public, in a setting that does not require fast-paced production quotas;

6.    Miller is unable to perform any of his past relevant work (20 CFR § 404.1565);

7.    Miller is considered a "younger individual" at all relevant time pursuant to 20 CFR § 404.1563;

8.    Miller has at least a high school education and is able to communicate in English (20 CFR § 404.1564);

9.   Transferability of skills is not material to a determination of disability because the Medical-Vocational rules support a finding that Miller is not disabled whether or not he has transferable job skills (20 CFR § 404.1568);

10.  Miller has the residual functional capacity to perform a significant number of jobs in the national economy (20 CFR §§ 404.1560, 404.1566(c) and 416.966); and

11.  Miller was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).


### IV.   **PLAINTIFF'S OBJECTIONS**

In his objections, Miller contends that the ALJ failed

1)   to properly consider and evaluate all of the medical opinions of record, and specifically, the opinions of Drs. Douglas, Labathia and Orvik;

2)   to consider all of the evidence of record before making his credibility finding; and

3)   to include all of the limitations documented in the medical evidence of record in his Residual Functional Capacity ("RFC") finding or in the hypothetical question to the VE.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

The Commissioner asserts that the ALJ properly reviewed, evaluated and considered all of the evidence of record pursuant to the regulations, assigned the proper amount of weight to the medical source opinions, properly evaluated Miller's subjective complaints, and included all of the limitations supported by the medical evidence of record in his hypothetical question to the VE.

## V.  MEDICAL EVIDENCE

The following medical history is relevant to the issues raised:

1.    A December 16, 2001 new patient office consultation from Richard Douglas, M.D., West Virginia Neurosurgery & Spine Center, indicating a diagnosis of low back pain, left leg pain and suspicion of a herniated disc on the left at L4-5 and a central and left sided herniated disc at L5-S1. Dr. Douglas recommended an MRI of the lumbar spine, an appointment with Dr. Justo for  pain management and a return visit following completion of the MRI;

2.    A September 30, 2001 back evaluation from Dr. High of Health Works, indicating complaints of pain primarily in the back and lateral-posterior thighs and increased pain with sitting and walking, and a recommended plan for physical therapy two times a

week for six weeks to decrease pain and increase lumbar stability
and functional movement;

3.    A June 18, 2002 progress note from Dr. Lattimer of
Lattimer  Chiropractic  Clinic  indicating  Miller  received  a
manipulation  procedure  and  findings  of  no  pathologies  or
misalignments at the PIR-sac, PLS-L5 areas;

4.    Dr. Lattimer's progress notes from June 21, 2002 through
September 8, 2003, indicating Miller complained of neck, low back
and hip pain and received manipulation procedure and a diagnosis of
lumbar  sprain/strain,  thoracic  sprain/strain,  and  cervical
sprain/strain.  On  December  2,  2002  Dr.  Lattimer  completed  a
Disability  Certificate  indicating  Miller  to  be  totally
incapacitated;

5.    A July 3, 2002 MRI report indicating an impression of
mild disc degeneration and diffuse bulging at L4-5 without frank
herniation  or  clear-cut  direct  neural  compromise,  and  minimal
degeneration involving disc material at T11-12;

6.    A  July  27,  2002  progress  note  from  Belington  Comm.
Medical indicating prescription for Darvocet;

7.    A September 5, 2002 letter from James D. Weinstein, M.D.
indicating Miller had complained of low back pain radiating into

both lower extremities since June 19. Dr. Weinstein found "perhaps a little decrease in the left ankle jerk, but nothing overt," and basically negative straight leg raising. Dr. Weinstein reviewed the lumbar MRI, stated Miller had a bulge at 4-5 and ordered a diagnostic myleogram/CT scan to check for nerve root compression;

8.   A September 13, 2002 report from a Lumbar Myelogram and CT scan indicating no focal disc protrusion, spinal stenosis, or gross nerve root impingement and no neurologic impingement seen;

9.   A September 18, 2002 letter from James D. Weinstein, M.D. indicating Miller had a negative myelogram/CT scan and opining that Miller had "some mild compression effects at 4-5 on the left," and that his symptoms indicated back strain because his pain was primarily in the low back with some radiation into both lower extremities. Dr. Weinstein recommended "some exercise and walking" and if severe left sciatica developed, an operation at the 4-5 level on the left;

10.  An October 11, 2002 progress note from Health Works indicating no change. Miller can go up stairs without difficulty, has difficulty going down stairs and has difficulty with prolonged walking and standing. Plan is to continue to work on decreasing pain and increasing activity;

11. An October 16, 2002 progress note from Health Works indicating subjective complaints of sore hips and back, directive to continue prescribed exercises, continue to use cane for ambulatory purposes, and an assessment that Miller was ambulating with improved posture;

12. An October 18, 2002 progress note from Health Works indicating Miller continued to complain of back pain, stated steps are easier but make his legs tired, an assessment of no significant change and a plan to continue all current exercises;

13. An October 24, 2002 progress note from Health Works indicating subjective complaints of pain in lumbar area and difficulty with prolonged walking and sitting, a treatment program of lumbar stretching and mobility exercises and a recommendation for continued physical therapy;

14. A December 13, 2002 Physical Residual Functional Capacity Assessment, from Thomas Lauderman, D.O., indicating Miller could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk (with normal breaks) a total of about 6 hours, sit (with normal breaks) a total of about 6 hours, had unlimited ability to push and/or pull, could occasionally climbing ramp/stairs, ladder/rope/scaffolds, balancing, stooping, kneeling,

crouching, crawling, no visual or communicative limitations, must avoid concentrated exposure to extreme cold, can have unlimited exposure to extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards. Dr. Lauderman noted Miller "still hurts, does woodworking 2-3 times/week, has mild degeneration disc L4-5." He reduced Miller's RFC two percent due to pain and fatigue;

15. A December 20, 2002 Psychological Evaluation from Martin Levin, M.A., indicating Miller was pleasant and cooperative, had normal posture, slow gait, and walked with a cane. He noted Miller's chief complaints as pain in legs and spine, often loses balance, pinched nerve in back and a bulging disc, and not working. Miller reported serious pain in his back, difficulty being around people, poor sleep, weight gain, sad and depressed mood, no crying spells or suicidal ideation, no obsessive compulsive symptoms, and no mental treatment history.

Mental status examination revealed Miller was neat and appropriately dressed and groomed, had a pleasant attitude/behavior, was cooperative, maintained good eye contact and behaved in a socially appropriate manner, speech was in normal tones and adequate communication skills, affect was broad, thought

process showed no abnormalities, thought content revealed no abnormalities, immediate memory was average, recent memory was markedly deficient remote memory, concentration persistence, pace were all average.

Diagnosis was Axis I 293.83 mood disorder due to back pain; depressed, Axis II no conditions present, Axis III back pain, asthma, allergies, all as reported by Claimant. He rated Miller's prognosis as fair;

16.  A December 24, 2002 office note from Dr. Khan, St. Joseph's Medical Plaza, indicating a complaint of back pain for six months and left leg completely numb. Dr. Khan suspected lower lumbosacral spine strain and prescribed amitriptylene, celebrex, paxil, and physical therapy. He noted no edema, intact peripheral pulses, negative straight leg raising, and apparent numbness of left leg from just below the inquinal ligament that is not related to any particular dematome;

17.  A January 8, 2003 Psychiatric Review Technique from Dr. Ramon indicating 12.04 affective disorders with mild restriction of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration,

persistence, or pace, and no episodes of decompensation, each of extended duration;

18. A January 10, 2003 MRI of lumbar spine without contrast indicting L1-2, L2-3, no focal disc herniations or central canal or neural foraminal stenosis noted on the sagittal images, L3-4: no focal disc herniation, patent central canal and neutral foramina, L4-5 diffuse disc bulge, asymmetric towards left versus small central to left paracentral disc herniation; mild to moderate central canal stenosis secondary to superimposed facet and ligamentum flavum hypertrophy, no significant narrowing, and L5-S1 no focal disc herniation. Impression noted as "disc desiccation with an asymmetric disc bulge versus small left paracentral disc herniation at L4-5 effacing the ventral thecal sac and probably impinging upon exiting nerve on the left," mild to moderate central canal stenosis without significant foraminal stenosis;

19. A January 17, 2003 return office visit note from Dr. Douglas indicating that review of the January 10, 2003 MRI revealed no focal disc herniation at L1-2, L2-3, central canal stenosis at L3-4 but no evidence of disc herniation or central canal stenosis, L4-5 diffuse disc bulge with asymmetric towards left with mild to moderate central canal stenosis, and no focal disc herniation at

L5-S1.  Dr. Douglas recommended a referral to pain management for epidural steroid injection, a CT of pelvis, and a total body bone scan;

20.  A January 24, 2003 office note from Dr. Khan indicating Miller reports "back pain is better since he has been on Elavil," normal chest and cardiac exam, no edema.  Dr. Khan increased the Elavil to 100 mg a day, noted Miller was going to see Dr. Douglas for a bone scan and abdominal CT, scheduled a colonoscopy and a follow-up in three months;

21.  A February 3, 2003 office note from Ronald Pearson, Jr., M.D. indicating no evidence of any masses, polyps, or diverticulosis, essentially normal examination.  Miller directed to repeat colonoscopy in three years;

22.  A February 4, 2003 return office visit note from Dr. Douglas indicating Miller had increasing complaints of left lateral thigh and calf pain.  Dr. Douglas noted that the January 27, 2003 total body bone scan revealed an unremarkable study, a re-review of the MRI lumbar myelogram revealed no evidence of focal disc protrusion, spinal stenosis or gross nerve root impingement, and a January 10, 2003 MRI of lumbar spine revealed a left paracentral disc herniation at L4-5. Dr. Douglas recommended proceeding with

13

upcoming pain management and a further evaluation following completion of pain management;

23.  A March 3, 2003 report from an initial consult, history and physical from Mona Justo, M.D., indicating her impression was lumbar radiculopathy, herniated disc at L4-5, mild spinal stenosis, facet arthropathy, and myofascial pain.  Her recommendation was to perform a diagnostic/therapeutic epidural steroid injection and to continue on Celebrex 200 mg, amitriptyline 50 mg, Paxil 40 mg and Tylenol;

24.  Note dated April 15, 2003 from United Pain Management indicating Miller had received a lumbar epidural steroid injection due to low back pain and a note dated  April 30, 2003 from United Pain Management that Miller had received a trigger point injection;

25.  A May 6, 2003 Physical Residual Functional Capacity Assessment from Dr. Brown indicating Miller can occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk (with normal breaks) a total of about 6 hours, sit (with normal breaks) a total of: about 6 hours, has unlimited ability to push and/or pull, can occasionally climb ramp/stairs, ladder/rope/scaffolds, balance, stoop, kneel, crouch, or crawl, has no manipulative, visual, communicative, or environmental limitations.

14

Dr. Brown noted that the degree of subjective pain seemed excessive in view of the objective findings, that the neurologic exam did not reveal any significant deficits, and that Miller should be able to tolerate light work activity;

26. A July 17, 2003 office note from Dr. Khan indicating Miller reported his back pain is much improved after pain clinic evaluation and treatment. Examination revealed no spinal tenderness, no neurological deficit but has had pain and numbness in legs off and on. He recommended a follow-up visit in six months or earlier if needed:

27. A September 17, 2003 Operation Record from Richard Douglas, M.D., United Hospital Center, indicating surgery for a preoperative diagnosis of left L4-5 herniated disc with left L5 radiculopathy and a postoperative diagnosis of left L4-5 herniated disc with left L5 radiculopathy.

28. A September 22, 2003 report of history and physical examination from Dr. Douglas indicting an impression of left L4 radiculopathy secondary to herniated disc on the left at L4-5 and a recommendation for surgery. Dr. Douglas noted that epidural steroid injection, anti-inflammatory medication and physical therapy had failed;

29.   A December 11, 2003 office note from Dr. Khan indicating Miller cut his forearm while cleaning a deer and noting "back pain has resolved since surgery;"

30.   A February 10, 2004 office note from Dr. Douglas indicting prior MRIs of lumbar spine disclosed no significant neural encroachment or stenosis and no evidence of recurrent disc herniation, review of prior total body bone scans showed no significant abnormal increased activity, and review of a prior x-rays of lumbar spine degenerative changes otherwise no evidence of spondylolisthesis.   Dr.   Douglas   recommended   continuation   of conservative management;

31.   A February 24, 2004 report from Ihab Y. Labatia, M.D. , Physical Medicine & Rehabilitation Specialists, indicating a chief complaint of axial lower back pain, an assessment that back pain appears to be mostly discogenic in nature, and a plan for left L4 and L5 transforaminal nerve root blocks for L4-5 discogenic pain and continued home exercise program;

32.   An April 7, 2004 operation record from Dr. Labatia, indicating a preoperative and postoperative diagnosis of lumbar intervertebral disc displacement, and transforaminal left L4 and L5 nerve root blocks under fluroscopy;

33.   An April 29, 2004 outpatient office visit report from Dr. Labatia indicating Miller reported injections improved pain symptoms in his left lower back slightly, but that he had begun having radiating pain down to left calf for last two weeks, tingling across left toes, left lower extremity pain was worse than left lower back pain as it is constant and is mostly over the posterior aspect of the left thigh and down to the calf, his left lower back pain is intermittent and is aggravated by supine position but not too bad with sitting or standing. Examination of lumbosacral spine region revealed no swelling or redness, normal lordosis, some tenderness in left lumbar paraspinal area on deep palpation, range of motion was full with 90 degrees flexion and thirty degrees extension, more pain with extension and lateral rotation of lumbar spine, negative bilateral Patrick's test, mildly positive Gaenslen's test and compression test for left S1 joint pain and bilaterally negative  straight leg raise test.

An assessment that left lower extremity radiating pain is new in onset and left lower back pain appears to be secondary to facet joint pain syndrome.  Dr. Labtia recommended a MRI with and without contrast to evaluate build up of postoperative scar tissue, left

L3-4, L4-5, and L5-S1 facet joint cortisone injections after MRI films and possible S1 joint cortisone injection;

34.  A May 11, 2004 MRI of the lumbar spine with and without IV contrast indicating unchanged normal alignment on sagittal images, mild narrowing of L4-5 disc accompanied with mild decrease in signal on T2 weighted images, indicating desiccation, no apparent encroachment upon exiting left L4 nerve root; no significant central spinal canal stenosis, presence of enhancing scar tissue at L4-5 level on left side without evidence of recurrent focal disc herniation, and the remaining discs and vertebral bodies are preserved in height and signal characteristics;

35.  A May 13, 2004 office note from Dr. Khan indicating complaints of back pain.  Examination revealed lower lumbosacral spine discomfort, positive straight-leg raising, no neurological deficit or radiculopathy, high cholesterol, and weight gain. Dr. Khan noted Miller is seeing Dr. Douglas and the pain clinic and is a  high risk for heart disease. He recommended a baby aspirin a day and a follow-up in one month;

36.  A May 24, 2004 office note from Dr. Douglas indicating review of May 11, 2004 MRI of lumbar spine with and without gadolinium revealed epidural fibrosis on the left at L4-5, no evidence of recurrent disc herniation and was otherwise an unremarkable study.  He recommended continued pain management, massage therapy and return as needed;

37.  A June 14, 2004 office note from Dr. Khan indicating improved back pain, normal chest and cardiac exam, and direction to follow up in three months;

38.  A June 23, 2004 operation record from Dr. Labatia indicating preoperative and postoperative diagnosis of lumbar spondylosis without myelopathy and left L3-4, L4-5 and L5-S1 facet joint cortisone injection under fluoroscopy;

39.  A July 20, 2004 outpatient visit report from Dr. Labatia indicating Miller reported complete relief from pain for one day following injection, however, pain had recurred to its preinjection level. Miller denied any radiating pain down the lower extremities, numbness or tingling in lower extremities and stated that the left lower back pain is constant and occurs mostly when standing and is better with sitting. Examination of lumbosacral spine region revealed no swelling or redness, normal lordosis, mild to moderate

tenderness in left lumbar paraspinal area on deep palpation, bilaterally negative straight leg raise test, stable neurological exam, and full range of motion. Dr. Labatia recommended radiofrequency ablation denervation of left lower lumbar facet joints specifically L-3, L-4 and L-5 medial branches, followed by a referral to physical therapy;

40. An August 18, 2004 operation report from Dr. Labatia indicating a preoperative and postoperative diagnosis of lumbar spondylosis and radiofrequency ablation of the left L-3-4, L-4-5 medial branches under fluoroscopy.

41. A September 14, 2004 office note from Dr. Khan indicating mild L5 discomfort, back pain, and medications including hydrocodone;

42. An October 15, 2004 diagnostic study report from United Hospital Center due to new onset of right low back pain indicating normal vertebral bodies and disk spaces, no evidence of spondylolysis or spondylolisthesis, no fracture, and an impression of a normal lumbar spine;

43. An October 15, 2004 outpatient office visit report from Dr. Labatia indicting almost complete resolution of left-sided lower back pain but new onset of right-sided lower back pain.

Miller denied any radiating pain down lower extremities, reported no numbness, tingling, or weakness in lower extremities, no fall or car accident but did report multiple falls yesterday due to his back pain getting worse with standing up from the sitting position. Examination of the lumbosacral spine region revealed no swelling or redness, normal lordosis, scar from previous surgery, tenderness mostly over the right lower lumbar paraspinal area and over midline on deep palpation, more pain with extension, neurological examination within normal limits with no motor or sensory deficits and 2+ bilateral ankle and knee jerks, and range of motion showed sixty degrees flexion and about fifteen degrees extension. Dr. Labatia recommended AP lateral and oblique views of lumbosacral spine, diagnostic blocks to his right L-3, L-4 and L-5 medial branches, prescription for Percocet and direction to decrease Lortab;

44. A November 4, 2004 outpatient office visit note from Dr. Labatia indicating complaints of recurrent pain symptoms, especially with regard to radiating pain down left lower extremity, primarily in posterior thigh area and posterolateral aspect of left lower leg, slightly worse left lower back pain although not as bad as it was before, denial of any weakness in lower extremities,

some numbness and tingling in left foot, denial of any bladder incontinence and denial of any injuries prior to recurrence or symptoms. Examination of the lumbosacral spine region revealed no swelling or redness, normal lordosis, scar from previous surgery, tenderness mostly in the midline over his scar on deep palpation, no tenderness in the paraspinal areas, range of motion showed ninety degrees flexion and 25 degrees extension, increased pain on extension, neurological examination within normal limits with no motor or sensory deficits and 2+ bilateral ankle and knee jerks. Dr. Labatia recommended repeat MRI of lumbar spine to evaluate possible radiculopathy in the left lower leg, may consider repeat RFA denervation of left lumbar facet joints if his MRI does not show radiculopathy, prescription refill for Percocet, and prescription for Neurontin;

45. A November 21, 2004 report from MRI lumbar spine indicating no change in post-surgical scar at L4-5 level with only mild distortion of thecal sac and partial approximation to left L5 nerve root;

46. A December 14, 2004 office note from Dr. Khan indicating Miller complained of lower L5 mild discomfort, back pain, and stated he was going to a pain clinic in Clarksburg;

47.  A January 10, 2005 outpatient office visit report from Dr. Labatia indicting constant left lower back pain radiating down the left lower extremity, left lower back pain worse during the daytime, radiating pain down the left lower extremity worse during the nightime, difficulties with sleeping when Percocet is taken at night, denies significant numbness or tingling in lower extremities, and denies any bladder or bowel incontinence. Examination of lumbosacral spine region revealed no swelling or redness, normal lordosis, scar from previous surgery, tenderness mostly over left lower lumbar joints on deep palpation, mild tenderness in the midline, no tenderness over right paraspinal area, range of motion showed ninety degrees flexion and limited extension to ten degrees, more pain with extension, and neurological exam in normal limits with no motor or sensory deficits in the lower extremities. Dr. Labatia recommended repeat RFA denervation of left lumbar facet joints, consideration of transforaminal left L-5 nerve root blocks, refill for Percocet, prescription for Duragesic patch, Trazodone to help with sleep and continuation of Neurontin for radiating pain down the left lower extremity.  Dr. Labatia noted that the November 21, 2004 MRI of the lumbar spine revealed no change in post surgical scar at the L4-5

level with only mild distortion of the thecal sac and partial approximation to the left L-5 nerve root;

48.  A February 9, 2005 operation record from Dr. Labatia indicting a preoperative and post operative diagnosis of lumbar spondylosis without myelopathy and radiofrequency ablation of left L3, L4 and L5 medial branches under fluoroscopy;

49.  A February 17, 2005 outpatient office visit report from Dr. Labatia indicting Miller reported that he does not recall any significant improvements in his pain symptoms, most pain in midline at this time, dull aching pain over entire aspect of left lower extremity, especially in lateral aspect of thigh and lower leg, denies any weakness in lower extremities, has had flare ups of pain in the ankles, knees and elbows past several weeks, and no bladder or bowel incontinence. Examination of lumbosacral spine region reveals no swelling or redness, normal lordosis, midline vertical scar from previous surgery, tenderness mostly in the midline area on deep palpation, no tenderness over paraspinal areas, range of motion showed about sixty degrees of flexion and extension limited to about ten degrees, more pain on extension, neurological exam is within normal limits with no motor or sensory deficits in the lower extremities except for diminished left L-4 dermatomal sensation and

slight decrease in strength in left ankle dorsi flexion and 2+ bilateral ankle and knee jerks. Dr. Labatia recommended diagnostic and therapeutic transforaminal left L-5 and S-1 nerve root blocks for possible radiculitis secondary to scar tissue, EMG exam of lower left extremity to rule out peroneal nerve palsy, prescribed Naprozen for arthralgias in multiple joints, increase in Duragesic to 50 micrograms every 72 hours, possible referral to pain clinic at UHC for consideration of spinal cord stimulator, and increase Neurontin to 600 mg three times a day. Dr. Labatia noted that Miller also has arthralgias in multiple joints, including the knees, ankles and elbows, that L-5 radiculopathy as cause of his pain cannot be ruled out as MRI revealed some scar tissue approximate in the left L-5 nerve root, and peripheral neuropathy specifically peroneal nerve palsy cannot be ruled out;

50. A March 15, 2005 outpatient office visit report from Dr. Labatia indicting no change in left lower back pain following epidural blocks. Miller reported radiating burning pain in the left lower extremity is worse than left lower back pain, left lower back pain is mostly in left posterior hip region, feels arthritic pains in joints including ankles, knees and elbows, denies numbness or tingling in lower extremities, and some weakness in left lower

extremity. Examination revealed diminished left ankle. Recommendation was for pulsed radiofrequency ablation of left L-5 nerve root;

51. An April 25, 2005 motor and sensory nerve conduction study from Dr. Labatia indicting normal distal latencies, conduction velocities and amplitudes, EMG needle exam in key root muscles in the LLE and left lumbar paraspinals shows no denervation potentials, normal motor unit amplitudes and durations, no polyphasics, normal recruitment pattern and activation rate conclusion, no electromyographic evidence of peripheral neuropathy in LLE, lumbar radiculopathy from L3 to S1, peroneal nerve palsy;

52. An April 25, 2005 West Virginia Disability Determination Service Mental Assessment from Morgan D. Morgan, M.A., indicating a diagnosis of Axis 1 major depressive disorder, recurrent, moderate, alcohol dependence, without physiological dependence, in remission, Axis II no diagnosis, Axis III Reported bulging disks in back, back pain, hyperlipdemia with a poor prognosis.  Dr. Morgan reported moderately deficient social functioning, mildly deficient concentration and persistence, moderately deficient pace, immediate and recent memory within normal limits and capability of managing own finances;

53.   A May 2, 2005 Psychiatric Review Technique from Joseph Kuzniar, Ph.D., indicating a diagnosis of depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking. Dr. Kuzniar found mild restriction of activities of daily living, moderate degree of limitation in social functioning and maintaining concentration, persistence and pace and no episodes of decompensation;

54. A May 2, 2005 Mental Residual Functional Capacity Assessment, Joseph Kuzniar, Ed.D., indicating Miller was not significantly limited in his ability to understand, remember and carry out detailed instructions, had no limitation in ability to remember locations and work-like procedures, understand and remember very short and simple instructions, sustain concentration and persistence, make simple work-related decisions, ask simple questions or request assistance, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness and be aware of normal hazards and take appropriate precautions, moderate limitation in ability to maintain attention and concentration for extended periods, perform activities within a

schedule, maintain regular attendance, and be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, get along with co-workers or peers without distracting them or exhibiting behavioral extremes.

According to Dr. Kuzniar's functional capacity assessment, the RFC ratings indicate Miller has the capacity to understand, remember and carry out 1-3 step instructions within a work setting demanding low social interaction;

55. A May 3, 2005 West Virginia Disability Determination Service, Disability Determination Exam from Bennett Orvik, M.D. indicating:

> Mr. Miller appears to have a significant problem with his left leg pain and does not appear to be able to do anything physical. He has a lifting limit of 15 pounds, which was imposed by his neurosurgeon. Of course, we do not have any documentation to confirm this, but if this is true, he certainly would not be able to do a physical job. Mr. Miller's difficulty with sitting for extended period of time would probably make it very difficult for him to do a sedentary job, as well.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

Dr. Orvik lists Miller's major complaints and gross physical findings as back pain and left leg pain, significant positive straight leg raise test, particularly in the left leg, evidence of mild atrophy of left thigh and left calf muscles, pain and limitations in sitting, walking, lifting, and traveling long distances. Significantly, Dr. Orvik noted:

> The only medical records presented for review for this examination is the report of a lumbar MRI which was performed in July of 2002. The impression was mild disk degeneration, diffuse bulging at L4-5 without frank herniation or clear-cut direct neural compromise and also mild degenerative disk disease involving t11-T12;

56. A May 10, 2005 outpatient office visit report from Dr. Labatia indicating complaints of low back pain radiating down left lower extremity, primarily over the lateral aspect of the lower leg, and overall his left lower extremity pain continued to be more bothersome than his lower back pain. Miller denied any significant weakness in lower extremities. Examination revealed equal pain with flexion and extension, bilaterally negative straight leg raise test on sitting and supine, and no motor deficits in lower extremities. Dr. Labatia recommended diagnostic and therapeutic block to his left S1 joint;

57. A May 13, 2005 operation record from Dr. Labatia indicating preoperative and postoperative diagnosis of left sacroiliac arthropathy;

58. A May 18, 2005 Physical Residual Functional Capacity Assessment, from Dr. Pascasio, indicating Miller can occasionally lift 50 pounds frequently lift 25 pounds, stand or walk (with normal breaks) a total of about 6 hours, sit (with normal breaks) a total of about 6 hours, has unlimited ability to push or pull, can occasionally climb ramp/stairs, ladder/rope/scaffolds, can frequently balance, stoop, kneel, crouch or crawl, has no manipulative or visual limitations, has limited hearing, unlimited speaking, must avoid concentrated exposure to extreme cold, has unlimited exposure to extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, and must avoid concentrated exposure to hazards.

Dr. Pascasio noted on the form that he disagreed with Dr. Orvik's May 3, 2005 statement that "problems with sitting for extended periods of time would make it difficult for [Miller] to do a sedentary job" because none of the physical findings supports Dr. Orvik's conclusion that Miller's sitting capability was impaired. Dr. Pascasio stated that Miller's "strength of extremities except

for the left leg at 4/5 are all within normal limits" and "therefore he [Miller] should be able to perform a medium type of work;"

59.  A May 31, 2005 neurosurgery clinic note from Gregory A. Helm, M.D., Ph.D, University of Virginia, indicating examination revealed some numbness in dorsum of the foot on left side, normal strength and negative straight leg raising test. Review of MRI scan demonstrates a small amount of scar tissue at the surgical site but no obvious surgical lesions. Dr. Helm recommended a CT/Myelogram to look more closely at the L4-5 level on the left;

60.  A June 21, 2005 CT Post Myelo L Spine from the University of Virginia indicating the following findings: at L2-3, no evidence of disk bulge, neuroforaminal narowing or central canal stenosis; at L3-4, no evidence of disk bulge, neuroforaminal narrowing or central canal stenosis; at L4-5 evidence of prior left sided hemilaminectomy and partial facetectomy at the L4-5 level, small central disk protrusion without evidence of significant neuroforaminal narrowing or central canal stenosis; and, at L5-S1, no evidence of a disk bulge, neuroforaminal narrowing or central canal stenosis. Impression was status post L4-5 left sided hemilaminectomy with a small central disk protrusion at this level

31

that does not produce significant central canal stenosis or neuroforaminal narrowing;

61. A June 23, 2005 letter from Dr. Helm to Dr. Labatia indicting review of most recent lumbar CT/Myelogram reveals no evidence of nerve root compression;

62. An August 23, 2005 operation record from United Hospital Center indicting continuing complaints of low back pain radiating down left lower extremity, no weakness in lower extremities, increasing restlessness, difficulty sleeping. Examination revealed localized tenderness over left lower lumbar paraspinal area over the facet joints, negative bilaterally straight leg raise test, and no motor or sensory deficits in lower extremities. An assessment that the pain down left lower extremity is most likely mechanical secondary to lumbar facet joint syndrome and no evidence of nerve root compression. Recommendation for repeat left lower lumbar facet joint blocks;

63. A September 20, 2005 Physical Residual Functional Capacity Assessment from Dr. Lateef indicating Miller can occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk (with normal breaks) a total of about 6 hours, sit (with normal breaks) a total of about 6 hours, has unlimited

ability to push and/or pull, can occasionally climb ramp/stairs, can never climb ladder/rope/scaffolds, can occasionally balance, stoop, kneel, crouch, or crawl, has no manipulative, visual, communicative limitations, must avoid concentrated exposure to extreme cold, can have unlimited exposure to extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation, must avoid concentrated exposure to vibration, and must avoid all exposure to hazards. Dr. Lateef found Miller credible and reduced his RFC due to pain but did not specify the amount of reduction;

64. A December 27, 2005 office note from Dr. Douglas indicating Miller continued to report low back and left hip pain. Examination revealed motor strength to be 5/5, 2+ deep tendon reflexes, intact sensory exam and negative internal and external rotation of the femur. Dr. Douglas recommended an MRI of lumbar spine, a total body bone scan, standing AP and lateral lumbosacral x-rays and return to clinic for further evaluation and recommendations;

65. A January 3, 2006 MRI report of the lumbar spine indicating no significant neural encroachment or stenosis suspected, stable MRI appearance of the spine compared to

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

November 21, 2004, minimal postoperative scarring anterior to the thecal sac at L4-L5 but no evidence for recurrent or residual disc herniation suspected;

66.  A January 3, 2006 report from a NM Bone Scan Total Body Scan indicating mild degenerative uptake about the right knee but otherwise unremarkable study with no abnormal uptake in the lumbar spine or left hip;

67.  A January 3, 2006 lumbar spine x-ray report indicating normal alignment with no evidence of fracture or dislocation, normal vertebral body and disk space height, normal sacroiliac joints, mild anterior osteophyte formation at L3-L4 and L4-L5 which are stable.  Impression was mild endplate osteophyte formation but otherwise negative exam;

68.  A January 24, 2006 return office visit note from Dr. Douglas indicating review of January 3, 2006 MRI of the lumbar spine revealed no evidence of recurrent disc herniation, the total body scan revealed no significant abnormal increased activity and the x-rays of the lumbar spine revealed degenerative changes, otherwise no evidence of sponsylolisthesis. Dr. Douglas stated:

> I would not recommend surgical intervention at
> this time.  I see no changes in his MRI to
> warrant surgical intervention.   I would

> recommend he continue conservative management
> with Dr. Labatia. This gentleman has been
> aggressively trying to get his pain alleviated
> and return to the work force, however, I do
> not think he will return to any type of
> gainful employment and at this given juncture
> I would wholeheartedly support his disability.
> He was given information entitled <u>The Back
> Book</u>. He is to return her p.r.n.

69. A February 16, 2006 operation record from Dr. Labatia indicating complaints of left lower back pain radiating down left lower extremity, continued radiating pain down posterior aspect of left thigh and calf, denies any lower extremity weakness, and continues to have tremors in left lower extremity. Examination revealed flexion of 80 degrees and extension 30 degrees, slightly more pain during flexion and bilaterally negative straight leg raise test. An assessment of constant radiating pain down left lower extremity most likely a residual radicular pain from his lumbar spine. Dr. Labatia recommended FRA denervation of left lumbar facet joints;

70. A May 23, 2006 office note from Dr. Khan indicating complaints of being tired, no energy, fatigue, weakness, and back pain;

71. A June 8, 2006 outpatient office visit note from Dr. Labatia indicating Miller continues to have cramps in left calf

area and left posterior thigh, and denies any numbness or weakness in lower extremities.  Examination revealed 90 degrees flexion and 30 degrees extension, slightly more pain during extension; negative straight leg raise test, neurological exam is within normal limits. An assessment of 50% relief of pain following RFA denervation of left lower lumbar facet joints. Recommendation to continue current pain medications and continue home exercise program;

72.  A June 14, 2006 office note from Dr. Khan indicating complaints of excessive fatigue, sleeps constantly and back pain;

73.  A June 21, 2006 office note from Dr. Khan indicating complaints of fatigue and back pain, with no change in fatigue;

74.  A July 20, 2006 outpatient office visit note from Dr. Labatia indicating complaints that low back and left lower extremity pain are worsening, difficulty sleeping, and denial of any numbness, tingling, or weakness in lower extremities. Examination revealed flexion of 80 degrees and extension 20 degrees, more pain during flexion, straight leg test is negative for SI joint pain, and neurological exam showed no motor deficits in both lower extremities.  An assessment that left lower back pain radiating down the left lower extremity is most likely secondary to post laminectomy syndrome, and that pain shown today is mostly

discogenic type of pain.  Dr. Labatia recommended consideration of a morphine pump;

75.  An August 7, 2006, outpatient office visit note from Dr. Labatia indicating preoperative and postoperative diagnosis of left trochanteric bursitis, and a left trochanteric bursa cortisone injection; and

76.  A September 19, 2006 Medical Assessment of Ability to do Work-Related Activities (Physical) from Dr. Labatia indicating Miller can occasionally lift ten pounds maximum, can frequently lift a negligible number of pounds, can stand/walk 20-30 minutes in 8-hour workday without interruption, can sit 30-45 minutes without interruption in 8-hour workday, can occasionally climb, balance, can never stoop, crouch, kneel, or crawl, can reach, handle, feel, see, hear, speak, but no pushing/pulling. Miller is restricted from heights, moving machinery, vibration, and is not restricted to temperature extremes, chemicals, dust, noise, fumes, and humidity.

## VI.  DISCUSSION

**A.  The ALJ properly considered the medical opinions of Drs. Douglas, Labatia and Orvik.**

Miller contends that the ALJ failed to properly evaluate the medical opinions of Drs. Douglas, Orvik and Labatia.  The

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

Commissioner, however, argues that the ALJ properly considered and evaluated all of the medical evidence of record. Pursuant to 20 C.F.R. §416.927(d)(2), controlling weight may be given to medical opinions only if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and 2) not inconsistent with other substantial evidence in the case record.

20 C.F.R. § 404.1527 directs how an ALJ must evaluate medical opinions:

> (d) *How we weigh medical opinions*. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
>
> (1) *Examining relationship*. Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
>
> (2) *Treatment relationship*. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence

that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(I) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a umber of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we

would give it if it were from a non
treating source.

(ii) *Nature and extent of the
treatment relationship.* Generally,
the more knowledge a treating source
has about your impairment(s) the
more weight we will give to the
source's medical opinion. We will
look at the treatment the source has
provided and at the kinds and extent
of examinations and testing the
source has performed or ordered from
specialists and independent
laboratories.

(3) *Supportability.* The more a medical source
presents relevant evidence to support an
opinion particularly medical signs and
laboratory findings, the more weight we will
give that opinion. . . .

(4) *Consistency.* Generally, the more
consistent an opinion is with the record as a
whole, the more weight we will give to that
opinion.

(Emphasis added.)

20 C.F.R. §§ 404.1527(e)(1)-(3) and 416.927(e)(1) provide that

opinions on ultimate issues, such as RFC and disability status, are

reserved exclusively to the Commissioner because they are

"administrative findings that are dispositive of a case," and

medical source opinions asserting that a claimant is "disabled" or

"unable to work" are not dispositive, although the ALJ must consider them in his evaluation.

In Evans v. Heckler, 734 F.2d 1012, 1015 (4th Cir. 1984), the Fourth Circuit held that an opinion from a claimant's treating physician is entitled to great weight and may only be disregarded if there is persuasive contradictory evidence. Later, in Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001), the Fourth Circuit held that "although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight. Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)) (per curium). Other courts have required that "[t]he ALJ's decision must also demonstrate the path of his reasoning, and the evidence must lead logically to his conclusion." Worzalla v. Barnhart, 311 F.Supp.2d, 782, 788 (E.D. Wis. 2004).

It is within this legal framework of regulations and case law that the Court reviews the R&R and the ALJ's analysis of the medical evidence.

### 1) Dr. Douglas

Miller contends that the ALJ's findings failed to address the opinion of Dr. Douglas, his treating neurosurgeon, that Miller

would not return to the workforce anytime soon and should receive disability. Relying on <u>Hines v. Barnhart</u>, 453 F.3d 559 (4th Cir. 2006), he argues that the ALJ violated the so-called "treating physician rule" by ignoring his opinion. In <u>Hines</u>, the Fourth Circuit held that courts typically "accord 'greater weight to the testimony of a treating physician' because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." 453 F.3d at 564 (quoting <u>Mastro v. Califano</u>, 611 F.2d 980, 982 (4th Cir. 1980). However, in <u>Hines</u> the Fourth Circuit also cautioned that "[t]he treating physician rule is not absolute. An 'ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence.'"

<u>Id</u>. at n.2.

     Although the ALJ in this case did not specifically refer to the January 24, 2006 return office visit note of Dr. Douglas, he did reference the MRI studies of Miller's lumbar spine ordered by Dr. Douglas on January 3, 2006. The ALJ noted that the MRI report indicated no evidence of recurrent disc herniation or significant neural encroachment or stenosis, and the total body scan showed no evidence of significant abnormal increased activity. Thus, contrary

**ORDER ADOPTING MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

to Miller's argument, the ALJ thoroughly reviewed all of the medical evidence of record, including Dr. Douglas's records, and relied on the objective medical evidence adduced from the tests ordered by Dr. Douglas.

Furthermore, with regard to statements from treating physicians concerning issues reserved to the Commissioner, the ALJ followed § 404.1527(e)(3), which provides:

> We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (e)(1) and (e)(2) of this section.

Thus, although the ALJ did not specifically reference Dr. Douglas's opinion that he believed Miller would not return to the workforce and therefore supported Miller's claim for disability, the record establishes that the ALJ did review all the medical findings and other evidence as directed by § 404.1527(e)(1) before he ultimately concluded that the record did not contain substantial evidence to support Dr. Douglas's opinion. Accordingly, the magistrate judge did not err in determining that the ALJ gave proper weight to Dr. Douglas's opinion.

**2) Dr. Labatia**

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Relying on <u>Worzalla v. Barnhart's</u> requirement of a demonstrated path of reasoning, Miller contends that the ALJ improperly rejected Dr. Labatia's opinion and "simply offered his own unqualified medical analysis and opinion that Dr. Labatia's opinion was not consistent with various objective and clinical findings in the record." The magistrate judge, however, determined that Miller's reliance on <u>Worzalla</u> was misplaced.

In <u>Worzalla</u>, the district court found that

> . . . the ALJ cited no medical evidence in support of his finding, deciding for himself 'the most accurate diagnosis.' . . . By making his own diagnosis and setting his own restrictions, the ALJ impermissibly 'played doctor.' *See Rohan*, 98 F.3d at 970 (stating that ALJs 'must not succumb to the temptation to play doctor and make their own independent medical findings').

311 F.Supp.2d at 795-96. The court criticized that ALJ for improperly rejecting a treating physician's report due to the physician's failure to provide the scores for the tests administered, and questioned what the ALJ would have done with the scores, noting that "provision of the figures is worth little absent the ability to properly evaluate them." <u>Id</u>. at 796.

Miller's case, however, is factually distinguishable from <u>Worzalla</u> in two respects. First, the ALJ in this case did rely on

objective medical evidence when deciding to afford little weight to Dr. Labatia's opinion. In point of fact, the ALJ specifically stated that Dr. Labatia's opinion was inconsistent with other medical evidence of record. Second, the ALJ did not attempt to interpret any of the medical evidence, but rather explained why, based on that medical evidence, he would not afford controlling weight to Dr. Labatia's less than sedentary assessment:

> Such a degree of limitation is not consistent with Dr. Labatia's own objective clinical findings on repeat examination nor is it consistent with the weight of the objective evidence as a whole. . . .
>
> Dr. Labatia's assessment, if supported, would be indicative of 'total disability;' yet, postoperative studies, including MRI and CT myelogram, have revealed no evidence of recurrent disc herniation or nerve root compression, and aside from a small amount of scar tissue at the surgical site, there is no evidence of obvious surgical lesions.

The magistrate judge did not err in determining that the ALJ had thoroughly considered Dr. Labatia's opinion and, based on the contradictory objective medical evidence contained in the record had decided to afford it little weight.

Relying on <u>Hines v. Barnhart</u>, Miller further contends that the ALJ impermissibly required objective proof of pain before he would

assign any weight to Dr. Labatia's opinion. Miller is correct that, in <u>Hines</u>, the court found that the claimant was entitled to rely exclusively on subjective evidence to prove that his pain was so continuous or severe that it prevented him from working a full eight-hour workday. 453 F.3d at 565. Significantly, however, this was only after the court noted that the claimant suffered from sickle cell disease, which rarely produces objective medical evidence.

In <u>Craig v. Chater</u>, 76 F.3d 585, 595 (4th Cir. 1996), the Fourth Circuit observed:

> While objective evidence is not mandatory at the second step of the test, [t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers.

Thus, in the Fourth Circuit claimants are not entitled to rely exclusively on subjective evidence. Rather, an ALJ is required to consider all evidence in the record, including objective medical evidence that may discredit a claimant's subjective complaints of pain.

In this case, the record establishes that the ALJ reached his conclusion that Dr. Labatia's opinion was entitled to little weight only after reviewing and evaluating all the evidence of record, including other contradictory medical evidence. The magistrate judge carefully reviewed the ALJ's reasoning process and correctly determined that substantial evidence existed in the record to support the ALJ's assignment of little weight to Dr. Labatia's opinion.

### 3) Dr. Orvik

Miller contends that the ALJ improperly rejected Dr. Orvik's opinion and failed to recognize the overwhelming consistency of the opinions of Drs. Orvik, Douglas, and Labatia. Dr. Orvik, a consultative examiner, stated that Miller "appears to have a significant problem with left lower extremity pain and does not appear to be able to do much of anything physical."

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

The ALJ, however, explained in detail why he assigned little weight to this opinion of Dr. Orvik:

> Little weight is also afforded this examining opinion as such a conclusion is overly reliant upon the claimant's subjective reports. Little weight is also afforded his further statements that if the claimant's reports of physician-advised lifting restrictions to 15 pounds and difficulty sitting extended periods were confirmed objectively, he would have a very difficult time performing sedentary work. In affording this examining opinion little weight, the undersigned notes that Dr. Orvik points out that the only abnormalities on exam was positive straight leg raise (which is also subjective), and decreased lumbar spine flexion and extension to 70 degrees (not marked). Otherwise, Dr. Orvik's report shows normal range of motion in all other areas including the upper extremities, neck knees, hips, and ankles. According to Dr. Orvik's report, there were also no areas of joint inflammation, tenderness, swelling or deformity, and while his stance appeared somewhat apprehensive and fearful of falling, he was not currently using a cane to ambulate. Dr. Orvik additionally noted that the claimant was able to tandem walk, walk on his heels/toes, and squat, all 'fairly well,' and with regard to his manipulative abilities, he demonstrated the ability to write well and pick up small objects well.

Here again, the ALJ's analysis followed the directives of 20 C.F.R. §416.927(d), which permits an ALJ to assign little weight to

opinions that are inconsistent with the objective medical evidence of record.

The magistrate judge was unpersuaded by Miller's argument that Dr. Orvik's opinion about Miller's disability and his inability to maintain employment was consistent with the opinions of Dr. Labatia and Dr. Douglas. As Magistrate Judge Seibert recognized, 20 C.F.R. §404.1527(e)(1) reserves this decision exclusively to the Commissioner. Accordingly, the magistrate judge did not err when he determined that the ALJ's decision to afford little weight to Dr. Orvik's opinion was well-grounded in the evidence of record. The ALJ's conclusion focused on the fact that Dr. Orvik's opinion was based primarily on subjective reports from Miller, which were inconsistent with the objective medical evidence of record.

**B.    The ALJ Properly Considered Miller's Credibility.**

Next, Miller contends that the ALJ failed to properly consider his credibility. He claims the ALJ erred at step two of the credibility analysis by requiring objective evidence of the severity of the pain itself rather than relying exclusively on subjective evidence. The Commissioner, however, asserts that the ALJ properly refused to rely solely on Miller's subjective complaints of pain because the regulations require him to consider

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

evidence of medical signs and laboratory findings demonstrating a medical impairment that could reasonably be expected to produce the pain.

Craig v. Chater sets forth the Fourth Circuit's well-established two-step process for evaluating a claimant's subjective complaints of pain:

. . .

> First, there must be objective medical evidence showing
>
>> the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and *which could reasonably be expected to produce the pain or other symptom alleged.*
>
> 20 C.F.R. §§416.929(b) & 404.1529(b) (emphasis added): cf. 42 U.S.C. § 423(d)(5)(A) ('There must be medical signs and findings . . . which show the existence of a medical impairment . . . which could reasonably be expected to produce the pain or other symptoms alleged . . . .') Therefore, for pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective medical evidence of the existence of a medical impairment 'which could reasonably be expected to produce' the actual pain, in the amount and degree alleged by the claimant.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

76 F.3d at 594. (Emphasis added.)

It is beyond dispute that, once a claimant makes the required threshold showing of a medical impairment that could reasonably be expected to produce the kind of pain complained of, the ALJ is required to consider all of the evidence, including the claimant's statements about his symptoms, to determine whether the claimant is disabled. Id. at 595. Although an ALJ must consider the claimant's statements, however, he need not credit them to the extent they are inconsistent with objective medical evidence in the record, or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged.  Id.

Here, although the ALJ determined that Miller had a medically determinable impairment that could reasonably be expected to cause pain, he found that Miller's statements about his pain were not entirely credible.  In particular, he discredited Miller's statements regarding the intensity, persistence and limiting effects of his pain, and determined that the degree of functional limitation described by Miller was inconsistent with the objective evidence of record.

In addition to the numerous medical tests and physical findings that did not support Miller's contention that his ability

51

to sit or stand was impaired, the ALJ cited specific examples of activity in which Miller engaged that were inconsistent with his complaints of totally disabling pain.

> The degree of functional limitation described by the claimant is not otherwise consistent with or supported by the weight of the objective evidence as a whole and the record shows that he has not always been fully compliant with treatment measures, including recommended weight loss and exercise. A review of the relevant treatment evidence reflects some admitted improvement of symptoms with regard to overall pain management, and during the relevant time period, he has managed to engage in activities that would seem inconsistent with presumptive disability include hunting (and associated deer meat processing) and woodworking. While he indicates that his ability to sit/stand is quite limited, he has conversely reported to Dr. Labatia, pain management specialist, that his 'back pain is not too bad' with these activities. Although he has had aggressive pain management, his neurological status has remained essentially intact throughout and there is no indication for further surgical intervention. With regard to his reported psychiatric distress, he has only recently sought formal treatment (although not documented), and findings on previous mental status examinations were indicative of no more than a 'moderate' degree of impairment. There is no indication that he has required crisis intervention or inpatient stabilization of his psychiatric symptoms at any relevant time, and similarly, no indication that he has required additional hospitalization for his back problems, status post back surgery. He does

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

> not reportedly require a hearing aid to
> address reported hearing loss, and there is no
> evidence of deafness. Clearly, he would have
> work-related limitations secondary to both
> his physical and mental impairments; however,
> the record as a whole does not support his
> claims of totally debilitating impairment.

(Emphasis added.)

Courts have long recognized that the ALJ is in the best position to observe the demeanor and determine the credibility of a claimant, see Shively v. Heckler, 739 F.2d 987, 989 (7th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)), and therefore afford special deference to the ALJ's credibility determinations. See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). In Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) (citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990)), the Seventh Circuit held that "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'"

The ALJ's credibility determination in this case was not "patently wrong." In point of fact, Magistrate Judge Seibert found that there was substantial evidence in the record to discredit Miller's subjective complaints of pain and support the ALJ's credibility determination. He also noted that, although the ALJ did

not cite to specific pages in the record to support his conclusion that Miller has not always been fully compliant with treatment, the record as a whole reflects that, on several occasions, Miller had reported improvement in his condition. For example, the July 17, 2003 office note of Dr. Khan indicated Miller had reported that his back pain was much improved following the pain clinic evaluation and treatment. A June 14, 2004 office note from Dr. Khan again reported improvement in Miller's pain status. There are numerous other such notations in the medical records, as well.

The magistrate judge did not err in concluding that the ALJ's opinion was based on substantial evidence and, in particular, that Dr. Labatia's less than sedentary assessment of Miller was inconsistent with Labatia's own objective clinical findings on repeat examination, and the objective medical evidence of record, including MRI and CT studies that revealed no evidence of recurrent disc herniation or nerve root compression and only a small amount of scar tissue at the surgical site.

**C.    The ALJ's Residual Functional Capacity Finding and Hypothetical Question to the VE included all limitations for which there was substantial support in the record.**

Miller argues that the ALJ violated SSR 96-8p and applicable case law by failing to include all of his confirmed limitations in

the hypothetical question he posed to the VE. He argues that the ALJ did not include the limitations contained in Dr. Labatia's opinion, the psychological limitations contained in the reports from the state agency reviewing physicians, or Miller's statement that he needed to lie down at times due to fatigue. The Commissioner contends that the ALJ's hypothetical questions included all of the limitations that could be substantiated in the record.

In <u>Walker v. Bowen</u>, 876 F.2d 1097, 1100 (4th Cir. 1989), the Fourth Circuit concluded:

> In order for a vocational expert's opinion to be relevant or helpful, it must be based upon consideration of all other evidence in the record, *Chester v. Mathews*, 403 F.Supp. 110 (D. Md. 1975), and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments. *Stephens v. Secretary of Health, Education and Welfare*, 603 F.2d 36 (8th Cir. 1979).

As well, in <u>Chrupcala v. Heckler</u>, 829 F.2d 1269, 1276 (3rd. Cir. 1987), the Third Circuit held that "a hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise, the question is deficient and the expert's answer to it cannot be considered substantial evidence." In the

same vein, in <u>France v. Apfel</u>, 87 F. Supp. 2d 484 (D. Md. 2000),

the district court stated that

> . . . based on his or her evaluation of the
> evidence, an ALJ is free to accept or reject
> restrictions included in hypothetical
> questions suggested by a Claimant's counsel,
> even though these considerations are more
> restrictive than those suggested by the ALJ.

<u>Id</u>. at 490 (citing <u>Martinez v. Heckler</u>, 807 F.2d 771, 774 (9th

Cir.1986)).

In the Fourth Circuit, an ALJ is afforded "great latitude in

posing hypothetical questions," <u>Koonce v. Apfel</u>, No.98-1144, 1999

WL 7864, at 5 (4th Cir. Jan. 11, 1999)(unpublished) (citing

<u>Martinez</u>, 807 F.2d, at 774),[1] and need only pose questions

containing the limitations substantiated by the evidence of record

that accurately reflect the claimant's limitations. In <u>Russell v.

Barnhart</u>, 58 Fed. Appx. 25, 30; 2003 WL 257494, at 4 (4th Cir.

Feb. 7, 2003), the Fourth Circuit held that a hypothetical question

may omit non-severe impairments but must include those that the ALJ

finds to be severe.  <u>In accord</u>  <u>Copeland v. Bowen</u>, 861 F.2d 536,

---

[1]   This Court recognizes that the United States Court of
Appeals for the Fourth Circuit disfavors citation to unpublished
opinions. Unfortunately, in this regard, there is not a better
indicator of what its decision might be than this and other
unpublished decisions cited in this opinion.

540-41 (9th Cir. 1988). Here, the ALJ's hypothetical question to the VE included all of the limitations substantiated by the evidence of record, and the ALJ was under no obligation to include limitations in Dr. Labatia's opinion that were inconsistent with the objective medical evidence.

The ALJ also properly addressed Miller's mental impairment. On that issue, the ALJ found that

> [a]lthough the medical evidence establishes that the claimant has exhibited some of the features of the 'A' criteria of mental disorders listing 12.04, a review of the relevant 'B' criteria indicates that none of the functional limitation categories are manifested at a degree which satisfies the full requirements of such listing. In order to fully satisfy the criteria of the aforementioned listing, an individual must exhibit 'marked limitation in at least two area of functioning or 'extreme' limitation in at least one area of functioning listed under this subsection. As detailed below, the evidence shows the claimant to exhibit no more than a 'moderate' degree of limitation at best in any area of functioning.

In his hypothetical question, the ALJ asked the VE:

> At the medium, at the medium - - the, the State agency reconsidered and presented a hypothetical that's of record in 11F that would have been prior to or at about the time of his back surgery with a light exertional level of work activity; lift 20 pounds occasionally, 10 pounds frequently; again,

stand and walk six hours in an eight hour day; sit six hours in an eight hour day; with all the posturals at occasion. Now we have to consider furthermore his hearing loss which would preclude working in a noisy environment, there's no indication of deafness, no indication of hearing-aid requirement, so it would just be avoiding the workplace in a noisy environment. Of course, at the light exertional level of work activity as described his past work would also be precluded, is that correct? . . . Now to the light hypothetical that I previously gave you I want you to consider that <u>such an individual would be limited to simple, routine type of work activity; that such an individual would be limited to occasional contact with supervisors, co-workers, and the general public; and I want you to consider the, again, the limitation to no fast-paced production type quota work activity as a result of distractions due to pain. At the light level with those mental non-exertional limitations would there be work in the national and regional economies such an individual could perform</u>?

(Emphasis added.)

Miller contends that the ALJ's question failed to include any of the psychological limitations confirmed by the state agency reviewing physicians. Magistrate Judge Seibert, however, noted that the ALJ had "properly accounted for" Miller's mental impairment by including in his hypothetical the fact that Miller "would be limited to simple routine type of work activity" and "would be

limited to occasional contact with supervisors, co-workers, and the general public." The magistrate judge also noted that an ALJ is afforded great latitude in formulating hypotheticals and need only include those limitations supported by the record. Thus, even though the ALJ did not recite verbatim Miller's psychological limitations confirmed by the state agency, his hypothetical included the mental non-exertional limitations supported by the record, and that is adequate.

With regard to Miller's argument that the ALJ's hypothetical question failed to include Miller's assertion that he needed to lie down due to fatigue, the magistrate judge concluded that the ALJ had no obligation to include that because there was no support for it in the record from any medical source. In fact, the only mention of a need to lie down came from Miller himself during his testimony at the hearing, when he stated that because he must lie down due to fatigue he would be unable to perform even a sedentary job. The magistrate judge concluded that, because the ALJ had determined that Miller's testimony regarding the intensity, persistence, and limiting effects of his symptoms was not entirely credible, the hypothetical properly was limited to only the limitations substantiated by the record, and therefore was legally adequate.

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

Again, because ALJs have great latitude in formulating hypotheticals, and are required to include only the limitations substantially supported by the evidence of record, the magistrate judge correctly concluded that the ALJ in this case did not err when he omitted mental limitations for which there was not substantial support in the record. After properly considering the evidence of record, the ALJ included in his hypothetical question to the VE all limitations substantially supported in the record.

Miller further contends that the ALJ failed to include all of the limitations related to his mental impairment in his RFC finding. The ALJ noted that the evidence in the record regarding Miller's mental functioning documented only mild or moderate deficiencies in the areas of insight, concentration, social functioning and pace.  The ALJ especially noted the April 25, 2005 West Virginia Disability Determination Service Mental Assessment from Morgan D. Morgan, M.A., that indicted moderate deficient social functioning, mild deficient concentration and persistence, moderate deficient pace, and immediate and recent memory within normal limits.

These deficiencies do not meet the requirements of 20 C.F.R. Pt. 404, Subpt P, App1, Listing 12.06, which requires that a

ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

claimant establish marked deficiency in two of the following: activities of daily living, maintaining social functioning, maintaining concentration, persistence or pace, or have experienced repeated episodes of decompensation each of extended duration. Here, the ALJ determined that the evidence of record demonstrated that Miller retained the

> capacity to understand, remember, and carry out one to three step instructions within a low-interaction, low-demand work setting and to adapt to routine changes commonly found within the workplace setting, despite have a 'moderate' degree of limitation in maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; working in coordination with or proximity to others without being distracted by them; completing a normal workday and workweek without interruption from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; and in getting along with others without distracting them or exhibiting behavioral extremes, and while he reportedly continues to experience a significant degree of depression and anxiety, he has not submitted treatment evidence to support his claims of recent treatment.

The ALJ thus properly considered all limitations substantially supported in the record in his RFC finding and did include all

## ORDER ADOPTING MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

limitations related to Miller's mental impairment in his hypothetical question.

## VII. CONCLUSION

Miller has not raised any issues that were not thoroughly considered by Magistrate Judge Seibert in his R&R. Moreover, the Court, upon an independent de novo consideration of all matters now before it, is of the opinion that the R&R accurately reflects the law applicable to the facts and circumstances before the court in this action.  Therefore, it is

**ORDERED** that Magistrate Judge Seibert's R&R is accepted in whole and that this civil action be disposed of in accordance with the recommendation of the magistrate judge.  Accordingly,

1.    the defendant's motion for Summary Judgment (Docket No. 13) is **GRANTED**;

2.    the plaintiff's motion for Summary Judgment (Docket No. 12) is **DENIED**; and

3.    this civil action is **DISMISSED WITH PREJUDICE** and **RETIRED** from the docket of this Court.

Pursuant to Fed.R.Civ.P. 58, the Court directs the Clerk of Court to enter a separate judgment order and to transmit copies of this Order to counsel of record.

**ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

If a petition for fees pursuant to the Equal Access to Justice
Act (EAJA) is contemplated, the plaintiff is warned that, as
announced in <u>Shalala v. Schaefer</u>, 113 S.Ct. 2625 (1993), the time
for such a petition expires in ninety days.

DATED: September 30, 2010.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE